# CIRCUIT COURT OF ALBEMARLE COUNTY

James F. Scott

v.

Jean Hall Rutherfoord

March 1, 2001

Case No. Ch. 5284-C

BY JUDGE EDWARD L. HOGSHIRE

In this civil action concerning custodial rights and child support arrangements, respondent Rutherfoord has moved this Court to incorporate as part of the divorce decree an agreement between the parties. For the reasons set forth below, this Court denies the motion to incorporate the agreement and rules that the agreement is not enforceable as a matter of public policy.[1]

*Statement of Facts and Procedural Posture*

Complainant James Scott ("Scott") and Respondent Jean Hall Rutherfoord ("Rutherfoord") were married in March 1980 in Charlottesville. In 1981 and 1983, the children of the parties, William and Meredith, were born. The parties separated in July 1985. On September 30, 1986, this Court entered a decree of divorce between Scott and Rutherfoord.

The divorce decree incorporated a separation agreement dated September 26, 1986, which specified that the parties would share joint physical and legal custody of the children. In addition, the agreement obligated Scott to pay Rutherfoord $10,000 per month as lump sum alimony and child support. Scott also agreed to pay for tuition, books and other school-related fees continuing

---

[1] Given the Court's ruling, it does not reach the issue whether the Agreement is supported by consideration.

through college or university education as well as camp fees, medical expenses, and costs of music or dance lessons.

In 1989, Rutherfoord remarried, and the divorce decree was modified. Scott was to pay $500 per month in child support for each child. This amount was in addition to the payments of the children's expenses as previously outlined.

In July 1996, the court increased the $500 monthly payment to $1,000 pursuant to Rutherfoord's motion to increase child support. Also, during this time, Rutherfoord moved, with the children, from Charlottesville to the District of Columbia. A court order requiring Rutherfoord to return to Charlottesville was suspended indefinitely when the parties reached agreement through a mediation process. A schedule for visitation was set, as was a date for resumption of joint physical custody. Scott moved to the District of Columbia in June 1996 to facilitate visitation with his children.

On November 12, 1996, a court order awarded sole legal custody to Rutherfoord. Visitation between the children and Scott was to continue according to a schedule presented in the order.

On December 9, 1997, the court ordered that "Will Scott shall visit with his father at reasonable times and if nothing can be worked out, Will is not required to visit." The court encouraged the resumption of overnight visitation between Meredith and Scott. A detailed visitation schedule indicated that Meredith was to spend every other Saturday with her father.

On March 30, 1998, the court ordered that visitation "shall be as agreed upon" between Scott and Meredith.

Notwithstanding the court orders, Scott did not have any visitation with his children in the period leading up to August 13, 1998. Scott contends that Rutherfoord was unfairly encouraging the children not to visit him and creating excuses for her failure to facilitate visitation. Additionally, Scott appealed the court orders.

Scott grew increasingly frustrated at his inability to obtain Rutherfoord's cooperation in arranging a visitation schedule. In August 1998, Scott, appearing desperate and without any other options, contacted John Taggart (Rutherfoord's attorney) in an effort to initiate discussions concerning visitation; Scott hoped to find some way to establish regular contact with his children and to take a pre-arranged vacation later in the month with the children. Taggart indicated during meetings at his office that additional monetary payments to Rutherfoord were the only way Scott could ensure visitation with his children. Scott acquiesced and negotiations ensued as Taggart proposed payments of $20,000 or $30,000 per month in child support; these amounts represented at least an $18,000 increase in child support

payments. The meetings also included discussion of a lump sum payment to be made to Rutherfoord at the time of Meredith's graduation from high school. At one point, a lump sum payment of $3,000,000 was proposed. Scott indicated that he felt he had no choice but to participate in these negotiations if he was to see his children. Scott explained why he entertained the proposals when he testified, "I wanted to see my children. It was a very simple decision."

As a result of extensive negotiations, the parties entered into an agreement on August 13, 1998 ("Agreement"). The Agreement established visitation schedules for weekends, school holidays, long weekends, summers, other holidays, and significant dates. A child support provision was added such that "if both children complete all visitation as agreed in this agreement for the preceding month, Scott shall pay to Rutherfoord the sum of $10,000 per month, per child, for the children's support and maintenance." If the visitation did not occur, Scott was not obligated to pay the $10,000. Additionally, if all visitation occurred as planned, "Scott shall pay to Rutherfoord, on the day Meredith enters college, the sum of one million dollars." Scott also agreed to drop his pending appeals on September 30, 1998, provided all visitation had occurred as scheduled prior to that date. Each party agreed to encourage the natural love and affection the children have for their parents and not to do anything to estrange or alienate the children from the other parent.

At no time during the negotiation period did either party suggest that additional child support payments were necessary for the maintenance and well being of the children. The terms of the Agreement were crafted to benefit Rutherfoord and it was made clear to Scott that, if Rutherfoord was not satisfied with the monetary amount, visitation would not commence. Taggart explicitly relayed this message when he explained that "If mama ain't happy, ain't nobody happy." Significantly, on the day immediately following the execution of the Agreement, both children were made available to be picked up by Scott in Colorado to begin the scheduled thirty-day visitation. It was thus established that the appearance of the children was directly linked to increased payments to Rutherfoord.

In February 1999, Scott filed suit against Rutherfoord in the District of Columbia seeking to invalidate the Agreement and compel Rutherfoord to return to him approximately $120,000 he paid in child support and related attorneys' fees under the Agreement. On July 6, 1999, the Court of Appeals of Virginia affirmed the final order of the Virginia court in Rutherfoord's favor, asserting that the Virginia courts had jurisdiction over the issues of custody and visitation. Rutherfoord obtained a stay of Scott's pending suit in

the District of Columbia. Rutherfoord now moves this Court to incorporate the Agreement as part of the divorce decree in this matter.

## Issue Presented

Scott asserts the Agreement amounts to an arrangement whereby the non-custodial parent is forced to pay for visitation rights. Such a link, Scott argues, cannot be reconciled with Virginia's "best interest of the child" standard and, thus, violates public policy. Rutherfoord contends the Agreement does not deny or diminish the rights of Scott and is in the best interests of the children because the Agreement encourages additional visitation with Scott. Rutherfoord argues the Agreement does not contract away visitation or child support, but expands both.

## Discussion

Virginia Code § 20-109.1 allows a court to affirm, ratify, and incorporate any valid agreement between parties concerning custody and maintenance of their minor children. Public policy favors prompt resolution of property disputes and disputes concerning the care of minor children in divorce cases through voluntary court-approved agreements. *See Morris v. Morris*, 216 Va. 457, 459 (1975). The validity of such agreements is to be determined pursuant to the same principles of construction and interpretation which are applicable to contracts generally. *See White v. White*, 257 Va. 139, 144 (1999). In deciding whether to incorporate an agreement pertaining to child custody, visitation, and support, this Court is guided by concern for the best interests of the children. *See Kelley v. Kelley*, 248 Va. 295, 298 (1994).

A court may refuse to recognize an agreement or may modify the arrangements in order to serve the best interests of the children and ensure that the agreement does not violate any public policy considerations. *See Yohay v. Ryan*, 4 Va. App. 559, 568 (1987). Courts in Virginia have consistently upheld the policy that the best interest and the welfare of the child shall be controlling in all disputes between parents. *M.E.D. v. J.P.M.*, 3 Va. App. 391, 396 (1986) (reversing trial court's decision to reinstate visitation rights for an abusive father because the court's focus was directed more upon the father's interests than upon the child's best interest); *Wilson v. Wilson*, 12 Va. App. 1251, 1254 (1991) (asserting the best interests of the child are paramount in cases concerning custody and visitation); *Eichelberger v. Eichelberger*, 2 Va. App. 409, 413 (1986) (holding the relationship between a child and non-custodial parent should not be subject to the dictates of the custodial parent

unless circumstances justify placing restrictions or conditions on the visitation privileges); *see also Taxson v. Taxson*, 31 Va. Cir. 348, 352 (1993).

The court in *Taxson* ruled that the public policy favored by Virginia law would be contravened by an agreement where spousal support and visitation provisions were interdependent. 31 Va. Cir. at 352. In *Taxson*, under the separation agreement, if defendant custodian failed to provide visitation and share information about the children, the plaintiff non-custodian was excused from paying spousal support. *See id.* at 350. Rutherfoord asserts that *Taxson* is inapposite because in the instant case, visitation cannot be denied or diminished because of failure to make any payment. However, in *Taxson* it was the *interdependency* of such clauses that prompted the court to rule as it did. The court concluded that the provision making the obligations regarding spousal support and visitation interdependent contract clauses violated Virginia's public policy. *See id.*

A Louisiana appellate court reached a similar conclusion. In *Macaluso v. Macaluso*, a stipulated judgment contained a provision indicating that "child support payments . . . are contingent upon the minor daughter's compliance with the full and complete visitation rights specified." 509 So. 2d 201, 202 (La. App. 1987). The court held that a provision making the payment of child support contingent on visitation is "clearly against public policy and is absolutely null on its face." *Id.* Though a case decided under Louisiana law, the court in *Macaluso* asserts public policy similar to that in the Commonwealth when it states that "for an agreement to be enforceable it must be in the child's best interest." *Id.* The duty of support owed by a parent is unilateral in nature; support is not a duty that a parent owes in exchange for visitation. *See id.* at 203. The court in *Macaluso* asserts that making child support payments contingent on visitation is not in the child's best interest, stating that "in addition to the possibility of a major disruption in her maintenance, this provision, which is a form of economic coercion, undoubtedly places an undue burden of responsibility and stress on her." *Id.* While there is no great concern for disruption of basic maintenance given the assets of both Scott and Rutherfoord in the instant case, the Agreement raises concerns about coercion and duress, which are undoubtedly not in the best interest of the children.

Courts around the country have maintained that child support payments and visitation rights must not be made dependent on one another. Though most cases address the issue whether child support may be diminished or terminated due to a reduction in visitation, the public policy asserted by the courts is persuasive in the instant case.

For example, in *Sharpe v. Sharpe*, the Supreme Court of Wyoming held that "the denial of visitation rights by either the custodial parent or the child does not constitute a change in circumstances justifying the reduction or termination of the noncustodial parent's support obligation." 902 P.2d 210, 216 (Wyo. 1995). Significantly, the court stated that "the duty of a non-custodial parent to support his or her child cannot depend on that parent's opportunity to exercise visitation rights." *Id.* In the instant case, the Agreement obligates the non-custodial parent (Scott) to pay additional child support depending on the availability of the children for visitation. Similarly, in *Henshaw v. Henshaw*, the defendant husband moved the court to reduce or terminate his child support obligation because he was denied visitation. 268 N.W.2d 289, 289 (Mich. App. 1978). In the latter case, the daughter testified that she had little in common with her father and did not want to visit him. *See id.* at 290. The court denied the father's request for reduction and held that "support payments may not be used as a weapon to force a child's visitation." *Id.* at 291. In the instant case, it appears the children maintained, at best, a strained relationship with Scott. Clearly, the Agreement was meant to compel increased visitation. As the *Henshaw* court aptly explains, "affection is bestowed, not bought." *Id.*

The Agreement in the case at bar amounts to an arrangement whereby the non-custodial parent pays for visitation rights. A child's affection and companionship cannot and should not be sold, like a mere commodity. *Buchanan v. Buchanan*, 170 Va. 458, 477 (1938). Additionally, this Court has great concern for the position in which the children find themselves as a result of the economic conditions expressed in the Agreement. An agreement linking the payment of child support to visitation violates public policy and cannot be enforced.

For the above-stated reasons, this Court denies respondent Rutherfoord's motion to incorporate the Agreement into the existing divorce decrees.