COURT OF APPEALS OF VIRGINIA

Present: Judge Felton, Senior Judges Coleman and Willis
Argued at Richmond, Virginia


JEFFREY SCOTT ROBERTS
                                              OPINION BY
v.    Record No. 1230-02-2        JUDGE JERE M. H. WILLIS, JR.
                                           SEPTEMBER 16, 2003
SONJA KNIPE ROBERTS


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                      Randall G. Johnson, Judge

            James J. Knicely (Thomas H. Roberts;
            Knicely & Associates, P.C.; Thomas H.
            Roberts & Associates, P.C., on briefs), for
            appellant.

            Susanne L. Shilling (Shilling & Associates,
            on brief), for appellee.


     On appeal from the termination of his in-person visitation

with the parties' two minor children and the award of sole legal

custody to Sonja Knipe Roberts (mother), Jeffrey Scott Roberts

(father) contends:  1) that the trial court erred by failing to

consider properly "the presumption that parents act in the best

interests of their children," 2) that the trial court's decision

violated his right to free exercise of religion, 3) that Code

§ 20-124.2 is unconstitutional, 4) that the trial court did not

apply Code § 20-124.2 properly, 5) that the trial court denied

him due process of law, and 6) that the trial court erred in

denying his motion for child support reduction.  We affirm the

judgment of the trial court.

BACKGROUND

On appeal, we view the evidence in the light most favorable to the party prevailing below, affording to the evidence all inferences reasonably deducible therefrom.  See McGuire v. McGuire, 10 Va. App. 248, 250, 391 S.E.2d 344, 346 (1990).

## Visitation

So viewed, the evidence disclosed that the parties were married on February 25, 1989 and were divorced by a final decree entered June 24, 1998.  Two children were born of the marriage, N. and H., aged twelve and ten years, respectively, at the time of the subject trial court hearing.  Following the divorce, the parties returned to court several times concerning visitation and support.  Mother was awarded physical custody of the children with liberal visitation granted to father.  After father moved to North Carolina, the children continued to visit him at the residence he shared with his new wife and her children from a previous marriage.  The current action began on December 3, 2001, when mother filed a "Motion to Suspend or Modify Visitation," alleging that continued visitation between father and the children was not in the children's best interests.

The children began complaining of physical ailments immediately prior to their having to leave for visitation with father.  They were apprehensive about the visits and complained that father threatened them and inflicted corporal punishment

upon them.  N. testified he and his sister disliked visiting father because they were required to spend much time reading the Bible and doing chores.  He testified that father did not allow them to watch television and allowed them no "free time." Father told the children that mother was a fornicator and adulterer and that she would go to hell.  Once, following an incident when the children obeyed mother instead of father, he told them if they died at that time they would go to hell.  On another occasion, when they were with father and mother called, father told them "the devil" was calling.  N. testified that he no longer mentions his mother in father's presence, because when he does, father tells him not to call her "Mom" because she is a sinner and that he should call father's present wife "Mom" because she is "godly."  Following an investigation by the North Carolina Department of Social Services concerning father's stepchildren, father and his present wife told N. he was a "spy and a master of espionage."  N. testified that he and his sister lived in fear of being punished by father and that father would threaten punishment without explaining what the punishment would be.

Mother testified that N. and H. did not want to visit father.  On the days before scheduled visits, they feigned illness or professed to be tired, crying and begging not to go. She testified that they did not perform as well as usual in school immediately before and after visitation.  Ordinarily both

do well academically. After mother unilaterally halted visitation in August, 2001, the children's dispositions and attitudes improved noticeably. They ceased feigning illnesses and began looking forward to weekends. H., in particular, began doing better in school.

Mother reported that on one occasion when father spanked the children he said he did so because God had commanded it. Father and his present wife insisted the children call him their "godly father." Father refused to discuss the children's welfare with mother. In a March 2, 2001 agreed-upon order, father agreed to undergo counseling to improve his parenting skills, but had not done so at the time of the ore tenus hearing.

Denise McAllister testified that she is married to father's present wife's first husband, Michael McAllister. She testified that father told Michael McAllister's children (who live with father and his present wife) that their father had deserted them, that he was not "righteous," and that they were not supposed to live with "nonbelievers" such as the McAllisters. She testified that father further told the McAllister children that because their natural father was not righteous, he (father) was now their real father. When Michael McAllister confronted father regarding these statements, father accused him of having broken his covenant with God by leaving his family and asserted that as a result, father was "[the McAllister children's] real

- 4 -

daddy." Father told the McAllister children that mother was a "wicked woman."

Erin Long, a teacher at the elementary school N. had attended the previous year and where H. was enrolled at the time of the hearing, testified that both children are bright and are good students. She said she repeatedly noticed "a change in N's personality" when he had to visit his father. Once, father came to her class to speak to N. and N. was visibly uncomfortable, similar to his demeanor on Mondays after visitation.

Dr. Leigh Hagan, a clinical psychologist, met with mother and the children. Hagan testified the children were "distressed" by father's proselytizing and by his condemnation of mother. Hagan explained that H. was particularly at risk of psychological damage due to father's telling her that women should not strive to accomplish what men accomplish and that women should be subservient to men. He opined that the danger of psychological damage stems not only from father's teaching these things to the children, but also from the punishments he meted out when they did not obey his teachings.

Father admitted he has told the children that he was disappointed in them and that they had insulted him. He acknowledged that he had accused N. of committing "spiritual adultery" by not reading the Bible when he was told to. He confirmed that he believed mother was living an "ungodly" life. He told the children that their mother had committed adultery

- 5 -

and that adultery was ungodly, and that she was a fornicator and ungodly because her fiancé lived with her and with the children prior to her marriage to the fiancé.

The trial court held that "the only real question [before it] is whether Dr. Roberts' conduct is such that continued visitation between him and the children is contrary to the children's best interests."  It concluded that

> [e]ven the most well adjusted child in the world . . . would have serious problems trying to reconcile the divergent views put forward by Ms. Roberts and Dr. Roberts. When those divergent views are added to the upheaval already existing in these particular children's lives, the children's best interests are obviously not being served.

The trial court noted that the parties had previously agreed that the children would live with mother most of the time and that mother should have primary custody.  "That being true," the trial court continued, "Dr. Roberts' telling them that the person he chose to be their primary caregiver is an adulterer and fornicator and will go to hell is unconscionable."  The trial court held that if father's religion "required" him to say such things to his children, "it is outweighed by the court's duty to protect the children's best interests.  If such duty is not required by his religion, his conduct is nothing more than a blatant disregard for his children's best interests."  Either way, the court concluded, the situation could not continue. Accordingly, the trial court awarded mother sole legal and

- 6 -

physical custody of the children, terminated father's in-person visitation, and limited father's contact with the children to scheduled, telephonic visits.

## Support

Father sought a reduction in his child support obligation, asserting that his income in a new job he was taking was $333,000, $17,000 less than the $350,000 he had been earning previously.

However, the $3,000 a month child support father has been paying pursuant to a July 21, 1999 order was based on his then-salary of $180,000. That order was also based upon the agreement of the parties. The trial court determined father's guideline support, based upon his new annual income and mother's income, would be $2,221.47, but denied father's request for a reduction in child support, holding that father had failed to demonstrate a material change in circumstances warranting a change.

## ANALYSIS

### I.

Father contends that in deciding to terminate his visitation, the trial court erred by "failing properly to take into account the presumption that parents act in the best interests of their children." This issue is embraced in our analysis in Part IV and is resolved by that holding.

II.

Father next contends that the trial court failed to "properly take into account" his right to free exercise of religion and that the trial court's decision violated his religious rights as guaranteed by the United States and Virginia Constitutions. Specifically, he contends that the trial court's decision infringed his "Free Exercise right to contribute to the religious instruction of his children."

"The Free Exercise Clause of the United States Constitution, Article I, U.S. Const. amend. I [and] the Constitution of Virginia, Va. Const., art. I, § 16, . . . prohibit state imposition of substantial burdens on the exercise of religion unless the state advances a compelling government interest which is furthered in the least restrictive manner." Horen v. Commonwealth, 23 Va. App. 735, 742, 479 S.E.2d 553, 556-57 (1997). See also Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990). Freedom of religion is not absolute, and "[c]onduct remains subject to regulation for the protection of society." Cantwell v. Connecticut, 310 U.S. 296, 303-04 (1940).

Following the mandate of Code § 20-124.2(B), the trial court determined that continued visitation with father was contrary to the children's best interests. That statute is religiously neutral, does not substantially burden the free exercise of religion, and rationally advances the legitimate

- 8 -

state interest of protecting children. "[T]he protection of children from harm, whether moral, emotional, mental, or physical, is a valid and compelling state interest." Knox v. Lynchburg Div. of Soc. Serv., 223 Va. 213, 223, 288 S.E.2d 399, 404 (1982). Furthermore, "[i]n any child custody decision [involving conflicting parental interests], the lodestar for the court is the best interest of the child," Smith v. Pond, 5 Va. App. 161, 163, 360 S.E.2d 885, 886 (1987), and the "rights of the parents must be tempered by this guiding principle," Haase v. Haase, 20 Va. App. 671, 681, 460 S.E.2d 585, 590 (1995).

The trial court specifically stated that it did not question the bona fides or validity of father's religious beliefs. It did not challenge or limit his rights to hold or to promote those beliefs. It did not base its decision on father's requirement that the children read the Bible, that they do chores, that they abstain from watching television, or that they be denied "free time." It based its decision exclusively on father's bitter denunciation of mother to the children, his eschatological threats concerning mother and, on occasion, the children, and his active undermining the ability of mother and the children to maintain a proper and wholesome relationship.

The trial court's decision addressed the visitation issue in the context of the compelling state interest in protecting the children's welfare and their best interests and took into

consideration the father's parental and religious rights. Father remains free to instruct the children on his religious beliefs and to teach them as he sees fit. He is barred only from condemning and threatening mother and the children. The mere fact that his visitation has been limited to telephone contact does not prevent his sharing his religious beliefs. Nor is he hindered or otherwise prohibited from practicing his religious beliefs. Thus, the trial court's ruling did not unconstitutionally infringe father's free exercise rights.

The trial court's order "terminated" father's in-person visitation. However, a custody or visitation ruling is never final. It is always subject to review upon a showing of a material change of circumstances. Eichelberger v. Eichelberger, 2 Va. App. 409, 345 S.E.2d 10 (1986); Code § 20-124.2. The termination of father's in-person visitation was a necessary and appropriate remedy for father's conduct, which the trial court justifiably found "unconscionable." Upon a satisfactory showing that this conduct has been curbed and will not recur, father may seek review of his visitation rights. We find the remedy imposed by the trial court under these circumstances to be appropriate to advance the compelling state interest in protecting the children in the least restrictive effective manner and to be consistent with father's parental and free exercise rights.

III.

Father contends that Code § 20-124.2 "on its face and as applied by the circuit court in this case is unconstitutional."

This Court will not consider on appeal an argument that was not presented to the trial court. Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998); Rule 5A:18. The requirements of Rule 5A:18 apply equally to constitutional claims. Deal v. Commonwealth, 15 Va. App. 157, 161, 421 S.E.2d 897, 900 (1992). "A [party] who fails to challenge the constitutionality of a statute in the trial court is barred from raising that issue on appeal." Parnell v. Commonwealth, 15 Va. App. 342, 349, 423 S.E.2d 834, 838 (1992). Father did not assert before the trial court that Code § 20-124.2 is unconstitutional. Accordingly, Rule 5A:18 bars our consideration of this question on appeal. The record reflects no reason to invoke the good cause or ends of justice exceptions to the operation of the rule.

IV.

Father next contends that the trial court erred in finding, based on the criteria set forth in Code § 20-124.2, that continued visitation with him was not in the children's best interests.

> In determining custody, the court shall
> give primary consideration to the best
> interests of the child. The court shall
> assure minor children of frequent and
> continuing contact with both parents, when

- 11 -

appropriate, and encourage parents to share in the responsibilities of rearing their children.  As between the parents, there shall be no presumption or inference of law in favor of either.  The court shall give due regard to the primacy of the parent-child relationship but may upon a showing by clear and convincing evidence that the best interest of the child would be served thereby award custody or visitation to any other person with a legitimate interest.  The court may award joint custody or sole custody.

Code § 20-124.2(B).

In custody determinations, "the controlling consideration is always the child's welfare . . . ."  Sutherland v. Sutherland, 14 Va. App. 42, 43, 414 S.E.2d 617, 618 (1992).  In determining what custodial arrangement serves the best interests of a child, the court shall consider the factors enumerated in Code § 20-124.3.  These factors include "[t]he relationship existing between each parent and each child, giving due consideration to the positive involvement with the child's life, the ability to accurately assess and meet the emotional, intellectual and physical needs of the child;" the needs of the child; the role that each parent plays in the upbringing and care of the child; "[t]he propensity of each parent to actively support the child's contact and relationship with the other parent;" "the ability of each parent to cooperate in and resolve disputes regarding matters affecting the child;" and "[t]he reasonable preference of the child . . . ."  Code § 20-124.3.

A trial court is not required to quantify or elaborate on what weight or consideration it has given to each of the factors in Code § 20-124.3 or to weigh each factor equally. See Sargent v. Sargent, 20 Va. App. 694, 702, 460 S.E.2d 596, 599 (1995). It is vested with broad discretion to safeguard and promote the child's interests, and its decision will not be reversed unless plainly wrong or without evidence to support it. See Farley v. Farley, 9 Va. App. 326, 327-28, 387 S.E.2d 794, 795 (1990).

The record demonstrates that the trial court carefully weighed the evidence and considered the factors set forth in Code § 20-124.3, as required by Code § 20-124.2. Its decision properly focused on the best interests and welfare of the children.

The evidence supports the trial court's finding that father's conduct was causing serious psychological and emotional injury to the children. They feigned illness to avoid visiting him. N. was visibly uncomfortable in his presence. H's school performance improved when the visits ceased. Not only did father not support the children's relationship with their mother, he actively attempted to undermine that relationship through his repeated condemnation of her. He accused mother, in the children's presence, of being an adulterer and fornicator and told the children that she was going to go to hell. He referred to mother as the devil when she called the children at

- 13 -

his house.  He threatened the children with damnation.  He and his present wife accused N. of being a "spy."

Determination of visitation rights is a matter of judicial discretion.  Eichelberger, 2 Va. App. at 412, 345 S.E.2d at 11. We will not set aside a trial court's visitation decision unless that decision is plainly wrong or without evidence to support it.  Farley, 9 Va. App. at 328, 387 S.E.2d at 795.  The record supports the trial court's determination that continued in-person visitation with father is contrary to the children's best interests.  That determination reflects a sound exercise of judicial discretion.

V.

As his fifth question presented, father asserts the trial court

> denied [him] due process of law in the conduct of the hearing (a) by refusing to permit [him] to voir dire and conduct inquiry into the reliability of the scientific methods used by [mother's] purported expert witness and by restricting [his] cross-examination of said expert, (b) by failing to exclude, and relying upon, impermissible hearsay evidence, (c) by relying on evidence not presented in the hearing without notice and without affording [him] an opportunity to rebut such evidence, and (d) by minimizing the harm from the children's exposure to [mother's] ongoing adultery.

"'Statements unsupported by argument, authority, or citations to the record do not merit appellate consideration.'" Ryan's Family Steak Houses v. Gowan, 32 Va. App. 459, 464, 528

- 14 -

S.E.2d 720, 723 (2000) (citation omitted). "Since this argument was not fully developed in the appellant's brief, we need not address this question." Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d 237, 239 (1992). Having presented no argument in his brief, father has waived this issue. See Littlejohn v. Commonwealth, 24 Va. App. 401, 409, 482 S.E.2d 853, 857 (1997); Rule 5A:20(e).

## VI.

Father finally contends that the trial court erred by "failing to apply the child support guidelines and/or to adequately specify its basis for failing to do so, and in failing to reduce [his] child support obligation to comply with the guidelines." He argues that the trial court erred by failing to order the presumptive amount determined by the guidelines set forth in Code § 20-108.2.

"In a petition for modification of child support and spousal support, the burden is on the moving party to prove [by a preponderance of the evidence] a material change in circumstances that warrants modification of support." Richardson v. Richardson, 30 Va. App. 341, 347, 516 S.E.2d 726, 729 (1999) (citation omitted). The petitioner must demonstrate a material change in circumstances from the most recent support award. See Antonelli v. Antonelli, 242 Va. 152, 154, 409 S.E.2d 117, 119 (1991) ("following entry of a final decree . . . a party seeking a change in court-ordered . . . support" must

- 15 -

prove a material change).  "In the absence of a material change in circumstances, reconsideration of support . . . [is] barred by principles of res judicata."  Hiner v. Hadeed, 15 Va. App. 575, 580, 425 S.E.2d 811, 814 (1993).

Father argued that the change in his salary from $350,000 to $333,000 represented a material change in circumstances. This change amounted to a decrease of only five percent.  More important, however, the previous support order – from which father was required to show a change in circumstances – was based upon his then-salary of $180,000.  Thus, the only change in circumstances demonstrated by the evidence is a salary increase of $153,000.  Furthermore, the earlier order was entered by joint consent of the parties.  This record supports the trial court's determination that father failed to demonstrate a material change in circumstances warranting modification of support.  Thus, the trial court was not required to apply the guidelines.

                              VII.

Wife's motion for an award of attorney's fees is denied. The parties shall bear their respective costs.

We affirm the judgment of the trial court.

                                        Affirmed.

Felton, J., concurring in part, and dissenting in part.

I respectfully dissent as to Part II of the majority opinion, but otherwise concur. Assuming without deciding that the trial court applied the correct standard of review in modifying its prior custody and visitation orders,[1] in my judgment, the trial court failed to narrowly tailor its remedy to balance the state's compelling interest in protecting the welfare and best interests of the children, consistent with father's constitutionally protected interests in the care, companionship, upbringing and religious education of his children.

The trial court, in my view, erred in ordering the termination of father's right to visit with his children in person; in severely restricting his ability to communicate with his children by telephone to a period of only thirty minutes on Saturday evenings; and in granting to mother, in her sole

---

[1] The trial court couched the issue in its opinion letter as follows:

> Still, the only real question is whether Dr. Roberts' conduct is such that continued visitation between him and the children is contrary to the children's best interests. The court finds that it is. Whatever can be said about Dr. Roberts' conduct, it cannot be denied that it is causing serious psychological and emotional damage to the children.

See also Code §§ 20-124.2 and 20-124.3.

- 17 -

discretion, the absolute right to terminate calls when she determined father was "engaging in the type of conduct for which his in person visitation is being terminated."

In its final order dated April 15, 2002, the trial court ordered:

> that the sole legal custody of the parties' children is awarded to plaintiff <u>with no visitation to defendant</u>.  Defendant shall have the right to talk with the children for up to one-half hour by telephone every Saturday night between 6:30 p.m. and 8:15 p.m. unless otherwise agreed to by the parties.  Plaintiff has the absolute right to monitor all such calls and the right to end any such call if she determines in good faith that the defendant is engaging in the type of conduct for which his in-person visitation is being terminated as set out in the . . . opinion letter [also dated April 15, 2002].

(Emphasis added).

Custody and visitation determinations are among the most difficult facing our trial courts.  When a marriage is irretrievably broken, the court is required to balance the constitutionally protected interests of parents in the care, companionship and education of their children with the welfare and best interests of the children.  Code § 20-124.2(B) provides in part:

> In determining custody, the court shall give primary consideration to the best interests of the child.  The court shall assure minor children of frequent and continuing contact with both parents, when appropriate, and encourage parents to share in the responsibilities of rearing their children.

- 18 -

> As between the parents, there shall be no presumption or inference of law in favor of either. The court shall give due regard to the primacy of the parent-child relationship . . . .

As the United States Supreme Court has observed:

> [T]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents . . . . Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.

Santosky v. Kramer, 455 U.S. 745, 753 (1982).

Dissenting on other grounds, then Justice Rehnquist wrote:

> I do not disagree with the majority's conclusion that the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment.

Id. at 774 (citations omitted). He further observed:

> [T]he interest of parents in a continuation of the family unit and the raising of their own children . . . cannot easily be overstated. Few consequences of judicial action are so grave as the severance of natural family ties. Even the convict committed to prison and thereby deprived of his physical liberty often retains the love and support of family members. "This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' Stanley v. Illinois, 405 U.S. 645, 651."

Id. at 787 (quoting Lassiter v. Dep't of Soc. Serv., 452 U.S. 18, 27 (1981)).

Parents have a fundamental right to determine how to raise their children, and we presume that fit parents act in their children's best interest. Troxel v. Granville, 530 U.S. 57, 65 (2000). The Due Process Clause protects the "fundamental right of parents to make decisions concerning the care, custody and control of their children." Id. at 66. In Griffin v. Griffin, 41 Va. App. 77, 581 S.E.2d 899 (2003),[2] this Court stated that "[c]ustody and visitation disputes between two fit parents involve one parent's fundamental right pitted against the other parent's fundamental right. The discretion afforded trial courts under the best-interest test, Code § 20-124.3, reflects a finely balanced judicial response to this parental deadlock." Id. at 83, 581 S.E.2d. at 902.

In Kogon v. Ulerick, 12 Va. App. 595, 405 S.E.2d 441 (1991), this Court said:

> In matters concerning custody and visitation, the welfare and best interests of the child are the "primary, paramount, and controlling consideration[s]." Mullen v. Mullen, 188 Va. 259, 269, 49 S.E.2d 349, 354 (1948). "A child's continuing relationship with both parents [is] an important consideration." M.E.D. v. J.P.M., 3 Va. App. 391, 397, 350 S.E.2d 215, 219 (1986). Except under unusual circumstances, a child's best interests are served by maintaining close ties between him and his

---

[2] A notice of appeal was filed with the Supreme Court of Virginia on July 24, 2003, by the appellee.

- 20 -

> non-custodial parent. <u>Eichelberger v.
> Eichelberger</u>, 2 Va. App. 409, 412, 345
> S.E.2d 10, 12 (1986)."

<u>Id.</u> at 596-97, 405 S.E.2d at 442.

Included in the fundamental liberty interest of a parent to raise his children is the right of a parent to educate his children in his religious beliefs. <u>Employment Division v. Smith</u>, 494 U.S. 872 (1990); <u>Wisconsin v. Yoder</u>, 406 U.S. 205 (1972); <u>Pierce v. Society of Sisters</u>, 268 U.S. 510, 518 (1925). In the case of custody and visitation of children by divorced parents, each parent has the right to educate the children, including in the parent's religious beliefs, without government intervention, except where there is a compelling government interest requiring such intervention, such as the physical and mental well-being of the children. <u>Yoder</u>, 406 U.S. at 230; <u>Prince v. Massachusetts</u>, 321 U.S. 158, 168 (1944). If the court determines, as the trial court did here, that there was harm substantial enough to interfere with the father's constitutionally protected interests with respect to his children, it must then engage in a balancing process to fashion a remedy that imposes the least possible infringement upon the parent's constitutionally protected interests. <u>Smith</u>, 494 U.S. at 881; <u>Sherbert v. Verner</u>, 374 U.S. 398 (1963); <u>Horen v. Commonwealth</u>, 23 Va. App. 735, 742-43, 479 S.E.2d 553, 556-57 (1997) (citing <u>Sherbert</u>, 374 U.S. 398; <u>Yoder</u>, 406 U.S. 205).

In my judgment, the record in this case reflects that the father's religious beliefs, his insistence that the children adopt them and be governed by them, and his insistence on telling his children that their mother and primary caregiver is "ungodly," is at the core of the parties' continuing disputes over custody and visitation. By father's agreement, mother was deemed to be the proper person to be the primary caregiver of the children, bearing the day-to-day responsibility for their safety, well-being and upbringing. Initially, father was granted liberal visitation rights. Subsequently, however, father relocated to Asheville, North Carolina, some considerable distance away from the children's home in Richmond, Virginia, making visitation with them at his new home difficult in terms of both time and travel. Additionally, father was remarried to a woman who shared his religious beliefs and who had three young children from a prior marriage. The children, whose custody and visitation are at issue here, voiced concern that, on their visits their father failed to give them the attention they wanted and needed because of the added responsibilities he had with the three stepchildren.

During periods of the children's visitation with him, father insisted that they read the Bible, do chores, and participate in religious activities consistent with his beliefs. If the children did not obey his directions to read the Bible or otherwise disobeyed him, he punished them, at times physically

- 22 -

by spanking.  Consistent with his religious beliefs, he told the children that when they disobeyed him, that behavior was a sin against both the father and God.  When they acted in a manner that displeased father, particularly in his instructions of Bible reading, he accused them of being "ungodly" and told them that they would likely be condemned to eternal damnation if the offending behavior continued.  On one occasion, after a period of visitation during Christmas 2000, father sent the children back with Bibles he had given them, with instructions that they read them at their home.  They told mother that they would be tested on the readings when they returned to visit father.  They also reported they would face punishment if they could not pass the test on the readings.  Mother returned the Bibles to father by mail, saying that they did not read the Bible in her house.

The record reflects that mother admitted adultery and that at a point in time prior to her remarriage, her fiancé lived in the home with mother and the children.  Consistent with his beliefs, father told the children that mother, their primary caregiver, was a fornicator, was ungodly, and would be condemned to hell.  Moreover, and again consistent with his religious beliefs, he insisted that the children call his new wife their "godly mother."

In its letter opinion, the trial court did not question the sincerity of father's religious beliefs.  It based its finding of harm to the children primarily on father's continued

denouncement of mother as being a fornicator, sinful, ungodly and condemned to hell.  It further based its findings on the children's strong resistance to the visits with father; their fear of his punishment; their announced headaches, stomachaches, and other physical/psychological complaints prior to their scheduled visits; as well as their despondency after returning from those visits.  While the denouncements of mother were consistent with his religious beliefs, they were found by the trial court to undermine the primary caregiver's responsibilities and authority in the eyes of the children, and were "causing serious psychological and emotional damage to the children."  The trial court further found that father's telling his children "that the person he chose to be their primary caregiver is an adulterer and fornicator and will go to hell is unconscionable."

Father argued to the trial court that he had "a duty to tell his children the truth about their mother."  The court ruled in its written opinion, "[i]f such duty is required by Dr. Roberts' religion, it is outweighed by the court's duty to protect the children's best interests.  If such duty is not required by his religion, his conduct is nothing more than a blatant disregard for his children's best interests."

In my view, the evidence presented to the trial court clearly reflected lack of good parenting on father's part, especially considering the ages of his children.  His constant

- 24 -

berating and condemnation of the children's mother and primary caregiver was sufficient for the trial court to modify, or even to suspend, visitation until father had agreed to desist his harmful behavior, and had undertaken the parental counseling he had earlier agreed to undergo. However, in my judgment, the evidence was insufficient for the trial court to enter an order terminating father's right to "in-person" visitation with his children, and to severely limit even his ability to talk with them by telephone. While the trial court found from the evidence that there was a compelling governmental interest in protecting the mental and physical well-being of the children, it failed to narrowly tailor a remedy consistent with father's fundamental liberty interests in the care, companionship and the upbringing of his children, and his right to educate his children in his religious beliefs.

Clearly, the father's right to freely exercise his religious beliefs, including the right to educate his children about those beliefs, is not limitless. See Prince, 321 U.S. 158; Cantwell v. Connecticut, 310 U.S. 296 (1940). But, any limits on that constitutionally protected interest must be narrowly tailored so as only to meet the compelling state interest, while not unconstitutionally inhibiting father's right to educate his children in his religious beliefs.

It is clear from its written opinion that the trial court carefully considered father's exercise of his religious beliefs

in his instruction to the children. It determined from the evidence presented in the case that the method and manner of father's exercise of that religious training was harmful to the children. Father insisted that mother was evil and would go to hell. He also told the children that they committed a type of adultery when they did not obey him and his instructions to read the Bible. At times he called the children ungodly. A clinical psychologist testified at the ore tenus hearing that continued visitation with father under these circumstances was not in the best interests of the children's health and well-being. While the trial court couched its decision in terms of the best interests of the children, it is also clear in its written opinion that its concern was with the health and well-being of the children. "Clearly, the protection of children from harm, whether moral, emotional, mental, or physical, is a valid and compelling state interest." Knox v. Lynchburg Div. of Soc. Serv., 223 Va. 213, 223, 288 S.E.2d 399, 404 (1982) (citing Stanley, 405 U.S. at 652)).

The trial court recognized in its written opinion that mother had requested only a modification of visitation or a temporary suspension of visitation. It reasoned, however, that because the trial court retained jurisdiction over matters pertaining to child custody and visitation during the minority

- 26 -

of the child,[3] there was no practical difference in its order terminating father's visitation and the mother's requested remedy of temporary suspension of visitation, because in each case father would have to petition the court for restoration of the visitation rights under change of circumstances.

While the procedure to regain visitation rights may remain the same, there is an untold ancillary impact of a court order terminating a parent's right to visit in person with his children.[4]  This Court in <u>Eichelberger</u>, 2 Va. App. 409, 345 S.E.2d 10, said:

> The authority vested in a trial court to decide issues concerning the care, custody, support and maintenance of the minor children, the visitation rights of the non-custodial parent, and the extent to which those rights and responsibilities shall be apportioned between estranged parents is a matter of judicial discretion which courts must exercise with the welfare of the children as a paramount consideration.  <u>See</u> <u>Allen v. Allen</u>, 188 Va. 717, 721, 51 S.E.2d 207, 209 (1949); Code § 20-107.2.  In the great majority of reported cases in which courts have been called upon to resolve conflicts between custodial and non-custodial parents, the disputes have involved areas of fundamental rights, such as education and religion.  The decisions in those cases reflect a reluctance to intervene absent a showing of harm to the child's welfare. . . .  When conditions are placed on visitation between

---

[3] <u>See</u> Code § 20-124.2.

[4] The trial court made no finding that father was an unfit parent.  <u>See</u> <u>Troxel</u>, 530 U.S. at 65 (parents have a fundamental right to determine how to raise their children; fit parents are presumed to act in their children's best interest).

- 27 -

> a non-custodial parent and his child, it should be with awareness that, except under unusual circumstances, maintaining close ties with the non-custodial parent is in a child's best interest. . . . [W]hen visitation privileges have been liberally granted without restriction, absent a finding by the court that the non-custodial parent has acted without concern for the child's well-being or best interest, has demonstrated irresponsible conduct, has interfered with basic decisions in areas which are the responsibility of the custodial parent, or finding that the activity which is questioned by the custodial parent presents a danger to the child's safety or well-being, neither the custodial parent nor the court may intervene to restrict activities during visitation.

Id. at 412-13, 345 S.E.2d at 11-12 (citations omitted).

I concur with the majority that there was sufficient evidence to affirm the trial court's finding that there needed to be a modification, or even temporary suspension, in the previously ordered visitation, including the father's promise to seek counseling in parenting skills. However, I would reverse and remand to the trial court with instructions to consider a remedy narrowly tailored to accommodate the state's compelling interest of assuring the physical and mental well-being of the children, while not unduly limiting the father's fundamental right to the care, companionship, upbringing and religious education of his children.

In my view, the trial court has multiple remedies available to it, short of termination of visitation, to insure the children's visitation with their father would be without concern

- 28 -

for their mental and physical well-being.  Moreover, Code § 20-124.2 specifically grants to the trial court authority to punish for contempt any willful failure of a party to comply with the provisions of its custody or visitation orders.

For the above reasons, I would remand to the trial court to narrowly tailor a remedy to accommodate the state's compelling interest to protect the children from harm, consistent with father's constitutionally protected interests in the care, companionship, upbringing and religious education of his children.

I respectfully dissent from Part II, but otherwise concur with the majority opinion.