3 Va.App. 391 (1986)
 350 S.E.2d 215
 3 VLR 1128
M.E.D.
v.
J.P.M.
Court of Appeals of Virginia
November 5, 1986
Thomas A. Guidoboni (Bonner, O'Connell & Scheininger, on briefs), for appellant.
Mark B. Sandground and Mark A. Barondess on brief for appellee.
Amicus Curiae: Women's Legal Defense Fund (Jane S. Reese; Laura A. Foggan; Donna R. Lenhoff; Women's Legal Defense Fund, on brief), for appellant.
Mother appealed the decision of the circuit court which reinstated father's visitation rights. Mother contended that the trial court failed to give proper attention to the child's welfare, erred in excluding evidence as to an allegation of sexual abuse, abused its discretion in reinstating visitation, and was without authority to enter a second order more than twenty-one days after the order reinstating visitation (Circuit Court of Fairfax County, Quinlan H. Hancock, Judge).
The Court of Appeals reversed and remanded. The Court held that the trial court abused its discretion because the court's focus was directed more upon the father's interests than upon the child's best interest. The Court also held that the trial court erroneously excluded evidence on a matter directly concerning the child's best interest, and that the trial court's order reinstating visitation was overbroad and punitive.
BENTON
BENTON, J. -- M.E.D. (the "mother") appeals from the circuit court's reinstatement of J.P.M.'s (the "father") visitation rights with their daughter. The court earlier suspended visitation rights after a report that the father sexually abused the child. The mother contends that (1) the court failed to give proper attention to the child's welfare; (2) the court erred in excluding evidence as to the allegation of sexual abuse; (3) the scope of the order reinstating visitation constituted an abuse of discretion; and (4) the court was without jurisdiction to enter a second order more than twenty-one days after the order reinstating visitation rights. We reverse and remand the case for further proceedings.
I.
The mother and father separated in May 1981, approximately nine months after the birth of their daughter. They executed an agreement in 1981 which gave sole custody of the child to the mother and granted the father "the right of visitation at all reasonable times and places." The visitations, however, did not run smoothly, and in March 1984 the parties consulted Dr. Edward Beal, a clinical psychologist at Georgetown University, for his recommendation regarding an appropriate schedule for the father's visitation. Following interviews with the mother, the father, and the child, Dr. Beal made a specific proposal for visitation and recommended that the father undergo psychological counseling to improve his parenting skills. Dr. Beal's recommendations included the following: that the father's visitation with his daughter "should be one-half days (4-6 hours) on successive days, Saturday and Sunday every two weeks . . . in the Washington Metropolitan area;" that the father "seek psychological counseling so that he may more appropriately understand and learn how he can be a responsible caring adult to his daughter;" that the mother cooperate with this counseling; and that on or before the child's fifth or sixth birthday a review be made of (a) the father's parenting skills, (b) the child's response to his visits and (c) the mother's cooperation, for the purpose of determining whether it would be appropriate to increase the father's visitation to include overnight visits and vacations.
On May 18, 1984, in an order entered pendente lite in a divorce action commenced by the mother, the court granted custody of the child to the mother, and provided for visitation by the father every other Saturday in the Washington area. The May 18 order also directed the father to participate in counseling with Dr. Beal and ordered the mother to make herself and the child available to Dr. Beal in conjunction with this counseling. The order in these respects essentially followed Dr. Beal's recommendations.
The May 18 order further provided for a July 12, 1984, hearing to review the case "at which time Dr. Beal's report and any other relevant and material evidence shall be considered." At the hearing on matters contained in the May 18 order, the father's counsel stated: "We would stipulate to another report from Dr. Beal." The mother told the court that "there is a very serious concern about sexual matters[,]" referring to "an admission in the deposition" concerning improper conduct by the father toward the mother's nine-year old daughter by a previous marriage and statements made by the parties' daughter. The court declined at that time to consider the mother's allegations, stating:
I am not going to label some man in effect some kind of pervert who can never see his children again without the strongest type of evidence. And you don't have that.
* * *
And I'm not indicating because I have said those things that I believe for one minute on this record that [the father] has any kind of problem. Let's find out. I'm not a trained psychiatrist, and I don't know what a few spank marks mean, or I don't know what some three-and-a-half-year-old girl says or doesn't say in double hearsay that can deny him or make findings that he can't see his child.
Let's go ahead and presume that Dr. Beal is a very highly competent professional. And he can determine these things, and he can report back.
Both parties have stipulated to go to Dr. Beal and to put his reports in evidence.
At some date after the May 18 order and before the hearing scheduled for July 12, an allegation was made that the father had sexually molested his daughter. The record discloses that the mother was the source of the allegation. On July 12, Dr. Beal wrote to the court concerning information from the child about sexual abuse:
It is . . . my understanding that visitation between [the child] and . . . [the father has] been suspended by you based on information supplied to you by [the father's counsel]. I have received information from [the child] about alleged sex abuse that since the matter as I understand it will no longer be before your court requires me to refer the matter to Protective Services so that a criminal investigation can be undertaken. On July 13, the court entered an order suspending visitation; the father agreed to the court's acting without a hearing. The criminal investigation alluded to in the letter apparently was not pursued. The father subsequently moved to reinstate visitation with his daughter. On the basis of an understanding between counsel, the father first presented his evidence. The court took notice of this arrangement and added:
But this case is going to proceed on the basis that it is presumed that this child has the right to visit with her father, and the father has the right to visit with the child, so that the burden is going to be on [the mother] in this case. After a three-day hearing in early March, 1985, the court found the evidence insufficient to show that the child had been molested or that the father had molested the child. The court granted the motion to reinstate visitation and, in an order entered on March 15, 1985, expanded the scope of the father's visitation to provide for visitation (1) every other weekend from 10:00 a.m. Saturday to 6:00 p.m. Sunday, or 6:00 p.m. Monday when that day was a federal holiday, and (2) two to four weeks in the summer, upon written notice sixty days in advance. After comment upon bias perceived in the mother's witnesses and a statement that the court "does not believe most of what she said," the March 15 order set out this finding:
[T]he mother in this case has made a premeditated and deliberate attempt to divest the father of any visitation with his daughter and the daughter's right to see and be with her father. This Court will not be a party to it. The March 15 order also contains the following provision which the mother challenges:
Now, having ruled as aforesaid, the Court, in a further effort to get to the bottom of this matter and without imposing any punishment upon the father, even though he may consider it just that, . . . will require for the next three months that a monitor selected by him will accompany him on all visitations. The purpose of this is to insure that if there [are] any further accusations or mention of child molestation, then the Court will know that the father cannot be responsible for it. The Court will have to conclude that the mother or someone connected with her in some way, is responsible for this. If it occurs, the Court will give serious consideration [to] granting custody to the father.
A panel of this Court stayed the March 15 order pending a determination of the mother's appeal. Following this court's grant of the stay, the father moved the trial court to amend the March 15 order to include the specific finding that visitation was in the child's best interests. The trial court entered an order on April 11, 1985, which reiterated a statement made by the court:
[L]et the record reflect that under no circumstances would this court have issued the decision that it did without taking fully into consideration the child's best interest. The mother filed a separate notice of appeal from the order of April 11.
II.
Although each dispute concerning custody and visitation presents unique circumstances, the court's judgment in every case is guided by a single, unvarying standard:
[T]he welfare of the infant is the primary, paramount, and controlling consideration of the court in all controversies between parents over the custody of their minor children. All other matters are subordinate. Mullen v. Mullen, 188 Va. 259, 269, 49 S.E.2d 349, 354 (1948); see Roe v. Roe, 228 Va. 722, 728, 324 S.E.2d 691, 694 (1985); Keel v. Keel, 225 Va. 606, 610, 303 S.E.2d 917, 920 (1983); Code | 20-107.2. This standard applies equally to contests over visitation. Oehl v. Oehl, 221 Va. 618, 624, 272 S.E.2d 441, 444-45 (1980).
The matter put in controversy by the petition to reinstate visitation must be determined in accordance with the best interests of the child. A child's continuing relationship with both parents will be an important consideration in every case. Indeed, Dr. Beal's first report on visitation informed the court: "[I]t is important for this family and in particular for [the child] to have contact with both of her parents." Furthermore, we believe that a desirable objective should be that the child will continue to receive the noncustodial parent's affection and nurture through the mechanism of visitation. See Eichelberger v. Eichelberger, 2 Va. App. 409, 412-13, 345 S.E.2d 10, 12 (1986).
Nevertheless, a court must terminate or restrict visitation when the child's best interests dictate that such action is warranted. A parent's sexual abuse of his or her child would indicate that visitation by that parent may not be in the child's best interests. See, e.g., In re Cheryl H., 153 Cal. App. 3d 1098, 1133, 200 Cal. Rptr. 789, 811-12 (1984); Ledford v. Bowers, 248 Ga. 804, 804-05, 286 S.E.2d 293, 294 (1982); M.N.D. v. B.M.D., 356 N.W.2d 813, 816-17 (Minn. App. 1984); cf. Brown v. Kittle, 225 Va. 451, 454-56, 303 S.E.2d 864, 866-67 (1983) (sexual abuse by half-brother). However, a court is not foreclosed from ordering some form of controlled visitation in order to rebuild a normal relationship if that is determined to be in the best interest of the child. The mother contends in this appeal that the court viewed the case simply as a contest between a mother and a father, and ignored the child's best interests by reinstating visitation, especially overnight visits, in the face of the accusation of sexual abuse.
The thrust of the mother's position, and the father's contrary argument, concerns the correctness of numerous evidentiary rulings on what became the central issue in this case: whether the father sexually abused his daughter. The odiousness of child sexual abuse makes it perhaps the gravest issue that can be presented in a domestic controversy. It would be entirely understandable, therefore, if a court were to approach such an issue with caution, which we believe occurred in this case, precisely for the reason that the accused parent becomes tainted with a charge of reprehensible misconduct.
Nonetheless, the extreme harm caused by child sexual abuse requires the court to subordinate all matters and, if necessary, to place a parent's interests second to the best interests of the child. The allegation of sexual abuse was the central factual issue presented in this case. But the ultimate inquiry was whether the father's visitation was in the child's best interests. The circuit court's determination whether visitation was in the child's best interest was within its discretion and is reversible only upon a showing that the court abused its discretion. Roe, 228 Va. at 723-24, 324 S.E.2d at 691; cf. Eichelberger, 2 Va. App. at 412, 345 S.E.2d at 12. We conclude that the trial court adopted a view in which "the welfare of the child [was not] regarded more highly than the technical legal rights of the parent." Forbes v. Haney, 204 Va. 712, 716, 133 S.E.2d 533, 536 (1963). Furthermore, we conclude that the circuit court's concern for the father's interests, although understandable in light of the gravity of the allegation, led the court to exclude evidence that might have been relevant to the child's best interests. See Armistead v. Armistead, 228 Va. 352, 356-57, 322 S.E.2d 836, 837-38 (1984); Keel, 225 Va. at 611-14, 303 S.E.2d at 920-22.
III.
The mother contends that the circuit court erred in excluding evidence concerning the allegation of sexual abuse. The excluded evidence was as follows: actions or statements of the child that were offered through the testimony of Dr. Beal, Cora Goldsborough, a child psychologist, and the mother herself; and proposed testimony by Faye Deaton ostensibly to rebut an expert witness for the father. The mother also contends that the circuit court erred when it refused to interview the child in chambers. The record is filled with numerous rulings by the court, either sua sponte or upon the father's objection, which exclude the mother's evidence regarding the allegation of sexual abuse.
A. Statements and Actions by the Child
On an undisclosed date after the April, 1984 hearing, the mother told Dr. Beal that the child had made several statements indicating sexual abuse by the father. Dr. Beal discussed the matter with the child on several occasions and received from her a detailed verbal account of sexual activity. The child's description was expressed in both explicit terms and the euphemisms of childhood. The child also used a "small doll family arrangement to identify herself, "Daddy " [the father] and "Daddy " [the mother's former husband]. The mother testified that the child used these names for the child's father and her former husband."
The court uniformly sustained hearsay objections to any testimony by Dr. Beal as to what the child said. The court also refused to admit Dr. Beal's letter of July 12, in which Dr. Beal informed the court that the child gave him information of sexual abuse. The mother argued in several instances, without success, that the statements were admissible, for example, as a "spontaneous explanation under emotional stress," to "establish the input for Dr. Beal," and to show that Dr. Beal had changed his recommendation for visitation as a result of "working with the parties or their child."
Cora Goldsborough, a clinical psychologist, began treating the child in June, 1984. Goldsborough received historical information from Dr. Beal and another psychiatrist, and an account from the mother about several explicit statements made by the child. The trial court consistently sustained hearsay objections to testimony by Goldsborough as to what the child said. Goldsborough was permitted to describe the child's responses to "play therapy" involving pillows and anatomically correct dolls.
Goldsborough said that in the first two months of therapy the child withdrew under the pillows and would not talk. Goldsborough later observed the child crawl under the pillows and take the large male doll with her. Goldsborough pulled back the pillows and saw that the child had her mouth on the doll's penis. In a therapy session one week before the March, 1985 hearing the child laid on the floor, undressed the male doll and placed it on top of herself. The court sustained a hearsay objection to Goldsborough's testimony that the child identified the male doll as "Daddy " [the father].
In her appeal the mother presents several bases upon which the court should have admitted the testimony of Dr. Beal and Cora Goldsborough. The father argues that the mother advanced only one ground at trial, the so-called res gestae exception to the hearsay rule, and therefore cannot escape the procedural bar of Rule 5A:18. It is true that with few exceptions the mother relied chiefly upon her res gestae position in the trial court. Ordinarily, we would not consider grounds for the admissibility of evidence that were not presented to the trial court. See Jackson v. Chesapeake & Ohio Railway. Co., 179 Va. 642, 650-51, 20 S.E.2d 489, 492-93 (1942). In this regard, the rationale of Rule 5A:18 permits no practical distinction between grounds for the admission of evidence and objections to the admission of evidence that are raised for the first time on appeal. Compare id. with Branch v. Commonwealth, 225 Va. 91, 96, 300 S.E.2d 758, 760 (1983) (refusing to consider hearsay objection first presented on appeal). Nevertheless, we will consider the reasons that the mother presents here under our authority to entertain questions on appeal "to attain the ends of justice" even though the proper reasons for admission of the evidence were not stated at the trial level. Rule 5A:18. Moreover, we believe that her arguments would not have altered the trial court's rulings, given the definite conviction by that court to exclude any and all statements made by the child.
First, the mother contends that Dr. Beal's testimony and letter of July 12 were admissible because the parties so stipulated at the proceedings in April, 1984. Even if the record established the existence of a stipulation, it would not have bound the court. Whether or not evidence should be admitted is a matter for the trial court's independent determination, based on the rules of evidence and the nature of the litigation.
Second, the mother briefly reiterates her res gestae argument. Dr. Beal said that the incidents of sexual abuse which the child described could have occurred perhaps two years before the interviews. We note that a young child may understand intervals of time differently than an adult understands them; however, the cases involving the res gestae exception indicate that the absence of temporal precision removes the child's statements from the scope of the exception. See generally Pepoon v. Commonwealth, 192 Va. 804, 811, 66 S.E.2d 854, 858 (1951).
Third, the mother contends that the child's statements to Dr. Beal and Cora Goldsborough were admissible under Code | 8.01-401.1 as facts forming the basis for their expert conclusions. [1] We believe that the language of the statute clearly allows the expert to express an opinion or draw inferences from inadmissible sources, such as hearsay. See Code | 8.01-401.1; cf. Simpson v. Commonwealth, 227 Va. 557, 565-66, 318 S.E.2d 386, 391 (1984); Foley v. Harris, 223 Va. 20, 29, 286 S.E.2d 186, 191 (1982). In this case, Code | 8.01-401.1 authorized both Dr. Beal and Goldsborough to express their opinions that the father sexually abused the child. Moreover, the statute permitted Dr. Beal to express an opinion, based upon hearsay, concerning the appropriateness of visitation. The expert's reliance upon hearsay is a matter affecting the weight to be given to his conclusions. Cf. Foley v. Harris, 223 Va. at 29, 286 S.E.2d at 191. Furthermore, we believe the record adequately demonstrates that practicing psychiatrists and psychologists normally use statements such as those involved in this case as a basis for expert opinions, and therefore the child's statements to Dr. Beal and Goldsborough are "of a type normally relied upon by others in the particular field of expertise." Code | 8.01-401.1. The father's expert witness, Dr. Joseph Novello, suggested in his testimony that the child's statements and behavior would be important factors in his consideration of the allegation of sexual abuse. Dr. Novello also said, in response to a question by the trial court, that he believed it was appropriate for him to see and talk with the child.
In any civil action any expert witness may give testimony and render an opinion or draw inferences from facts, circumstances or data made known to or perceived by such witness at or before the hearing or trial during which he is called upon to testify. The facts, circumstances or data relied upon by such witness in forming an opinion or drawing inferences, if of a type normally relied upon by others in the particular field of expertise in forming opinions and drawing inferences, need not be admissible in evidence.
The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.
Fourth, the mother contends that the child's statements and assertive actions were admissible to prove her state of mind, if not to demonstrate the truth of the allegation of sexual abuse. We agree. Whether the evidence established that the father sexually abused the child or whether instead it established that the child believed that she was so abused are distinctly separate matters. We express no opinion on the use of these statements and assertive actions to prove the former, leaving it for the trial court's determination on remand. The fact that the child behaved as if she were abused, however, was highly relevant in a case involving visitation. Dr. Beal said on cross-examination that the relationship between the father and the child had to be monitored because the child believed the father had sexually abused her. Dr. Novello, the father's expert witness, said nearly the same thing, recommending that visitation take place in the presence of a third party, "perhaps a child psychiatrist," to "reestablish the communication and the bond of trust" between the father and the child. Under the circumstances of this case, therefore, we believe the court should have permitted the testimony as to the child's statements and assertive actions for the purpose of establishing the child's state of mind. See Service Steel Erectors Co. v. International Union of Operating Engineers, 219 Va. 227, 236, 247 S.E.2d 370, 376 (1978); United Construction Workers v. Laburnum Construction Co., 194 Va. 872, 896, 75 S.E.2d 694, 709-10 (1953), aff'd, 347 U.S. 656 (1954).
We also note as a related matter that Dr. Beal revealed on cross-examination his impression of the mother as "a person [who] would distort the truth." Dr. Novello testified that a false accusation of sexual abuse "would certainly poison . . . the relationship between the child and the father," and would have enduring consequences for the child. We express no opinion as to the truth or falsity of the allegation of sexual abuse. We do believe, however, that a parent's encouragement of a child to believe she had been sexually abused was a circumstance for the trial court to consider in determining what was in the child's best interests.
B. Rebuttal Testimony by Faye Deaton
The father offered the testimony of Dr. Joseph Novello, who is certified in adult and child psychiatry, to challenge the allegation of sexual abuse. Dr. Novello examined the father on three occasions in July, 1984, and reviewed a psychological test report prepared by a clinical psychologist. The psychologist did not testify. Dr. Novello said that in his opinion, based upon his evaluation and the results of the psychological testing, the father did not perform a sexual act upon his daughter.
The mother's counsel cross-examined Dr. Novello at length about his familiarity with the specific results of the psychological tests. [2] Dr. Novello said: "I rely on the psychologists to do the testing. I am not trained as a psychological tester. That's something that psychologists generally do, not psychiatrist[s]."
The mother in turn called Faye Deaton, a clinical social worker experienced in evaluating psychological testing of "perpetrators of sexual activity." Deaton was asked on voir dire a number of questions pertaining to her training and experience in cases of sexual abuse generally and testing of sexual abusers particularly. [3] At one point in the inquiry Deaton was asked which particular tests she looked at in her experience with "perpetrators." The last term prompted the court to inquire whether Deaton's testimony would be "based on the supposed or hypothetical factor that [the father] is a perpetrator." Counsel said she proposed to have Deaton "share with us what particular factors in the testing are important and why they are important, in order to help the court make a determination. I'm not going to ask her an ultimate opinion question." The court sustained an objection to any expert testimony by Deaton and explained its ruling:
[I]n some kind of a criminal case when, and if, someone has been found guilty of an offense such as to what you allude, this witness may very well be qualified and may, in fact, be an expert witness. That is not this case and the objection is sustained.
We agree with the mother's argument that the father "opened the door" to Deaton's testimony when Dr. Novello said "there were no indicators in the psychological testing . . . for urges in that direction [i.e., "a child molester, a sexual pervert"]." The record clearly reveals that Deaton is qualified by training and experience to testify as an expert on this subject. Furthermore, the mother was entitled to present expert testimony on the interpretation to be given to specific measures in the psychological tests, a matter that is beyond common understanding. See Cantrell v. Commonwealth, 229 Va. 387, 394-96, 329 S.E.2d 22, 27-28 (1985); Cartera v. Commonwealth, 219 Va. 516, 518-19, 248 S.E.2d 784, 786 (1978). The court therefore abused it discretion in not permitting Deaton to testify. Maxwell v. McCaffrey, 219 Va. 909, 912, 252 S.E.2d 342, 344-45 (1979); see Landis v. Commonwealth, 218 Va. 797, 799-800, 241 S.E.2d 749, 750-51 (1978); Kern v. Commonwealth, 2 Va. App. 84, 86-88, 341 S.E.2d 397, 398-99 (1986).
C. Refusal to Interview the Child in Chambers
The mother's counsel informed the court that arrangements had been made to bring the child to the courtroom and requested that the court "meet with" her. The following exchange occurred after the father's counsel stated there was no need to bring the child into court:
THE COURT: Do you plan . . . to call the child as a witness?
[THE MOTHER'S COUNSEL:] Formally in a courtroom? Sitting on the witness chair?
THE COURT: Yes
[COUNSEL:] No, Sir; not unless you wanted it. We would consent to see her in chambers.
THE COURT: Well, if that's you[r] inquiry, the answer is no. That will not be necessary that you bring her here. The mother contends that the court should have consented to interview the child in chambers, and that the court's refusal to do so constituted reversible error. The mother took no affirmative step to tender the child as a witness and, in fact, expressly eschewed any such step, as the excerpt above indicates. In the absence of any action to call the child as a witness, we believe the court did not err in declining to "meet with" her in chambers. See Hepler v. Hepler, 195 Va. 611, 619-20, 79 S.E.2d 652, 656-57 (1954). Although there may be cases in which the court on its own initiative will call for testimony by a child, we do not think the court's refusal to interview the child in this case was an abuse of discretion.
IV.
After the mother noted an appeal from the order of March 15, 1985, which order was stayed by a panel of this Court, the father moved the trial court to amend the March order to include a finding that reinstatement of visitation was in the child's best interests. The trial court then entered an order on April 11, 1985 clarifying its visitation order. The second order reiterated an oral ruling made on March 29, 1985:
[U]nder no circumstances would this Court have issued the decision that it did without taking fully into consideration the child's best interests . . . . [T]his Court finds, without hesitation or reservation, that after full consideration of this matter this Judge deemed it to be in the best interests of this child to have the visitation with the father as outlined in the prior decision[.] We believe that it is not necessary for us to decide whether the court was without jurisdiction under Rule 1:1 to enter the April order, as the mother contends, or whether the April order merely corrected a clerical oversight pursuant to the authority conferred by Code | 8.01-428(B), as the father contends. Compare In re Department of Corrections, 222 Va. 454, 463, 281 S.E.2d 857, 862 (1981) (court cannot suspend sentence by order entered more than 21 days after final judgment) with Dorn v. Dorn, 222 Va. 288, 291, 279 S.E.2d 393, 394-95 (1981) (court may correct an order containing an attorney's drafting error more than 21 days after final judgment) and Code | 8.01-428(B) (clerical errors in judgments, resulting from oversight or inadvertent omission, may be corrected at any time before an appeal is docketed). The decision in this case is based upon our review of the entire record; we have considered the statement in the April 11 order as part of that record. Our principal concern is with the substance and effect of the March 15 order reinstating visitation. For reasons expressed above, we conclude that the court erred in excluding evidence that was relevant to the issues presented in the father's petition. Additionally, we believe the March 15 order was overbroad.
First, the father petitioned the court to "reinstate visitation." The March 15 order expanded the scope of visitation to include overnight visits and several weeks in the summer. This enlarged visitation not only went beyond the relief requested by the father, but also was contrary to Dr. Beal's initial recommendations concerning visitation and the father's parenting skills. The initial provision for visitation, embodied in the May 18, 1984, order was predicated upon the father undergoing psychological counseling with Dr. Beal. Although the matters to be addressed in this counseling were overshadowed by the subsequent allegation of sexual abuse, we see nothing in the record to warrant an expansion of visitation greater than originally provided.
We are also concerned about another aspect of the March 15 order, namely the provision for a monitor selected by the father to accompany him on all visits. In itself, the monitor provision presents no concern; indeed, we believe it was warranted by the circumstances of this case. The terms of the order, however, further provided that if there were any further "accusations or mention of child molestation," the court would "know that the father cannot be responsible for it" and "have to conclude that the mother or someone connected with her in some way . . . is responsible for this." The order strongly implied that any accusation or mention of sexual abuse would result in the court's granting custody of the child to the father. Apart from the fact that the monitor was to be selected by the father and possibly influenced by him, the terms of the order are contrary to the legislative intent encouraging reports of sexual abuse. See Code || 63.1-248.1 to 63.1-248.5.
It is reasonable to conclude that the trial court, in its March 15 order, "was attempting to fashion a remedy to comport with the exigencies of the case before it." Leisge v. Leisge, 224 Va. 303, 309, 296 S.E.2d 538, 541 (1982). We believe, however, that in doing this the trial court's order distinctly manifested a punitive design. The court had jurisdiction to alter its previous determinations of custody and visitation, Code | 20-108; however, the exercise of this jurisdiction is predicated upon the child's best interest. It may not be used to punish a parent. See Rowlee v. Rowlee, 211 Va. 689, 690, 179 S.E.2d 461, 462 (1971); cf. Greene v. Greene, 223 Va. 210, 212, 288 S.E.2d 447, 448 (1982).
V.
The trial court found a "premeditated and deliberate attempt" by the mother to divest the father of visitation. It is apparent the court believed the allegation of sexual abuse was the means employed toward this end. We reverse because we conclude that the court erroneously excluded evidence on a matter directly concerning the child's best interest and because the order reinstating visitation was overbroad and punitive. After reviewing the entire record we conclude that the court's focus was directed more upon the father's interests than upon the child's best interest. By adopting this view of the case the court abused its discretion.
The judgment of the circuit court, therefore, is reversed and the case remanded for further proceedings consistent with this opinion. During the pendency of such proceedings the court may grant visitation privileges to the father, provided that any visitation shall be limited to the Washington Metropolitan area, not include overnight visits, and take place in the presence of a monitor approved by the court, taking into consideration the recommendations of Dr. Beal.
Reversed and remanded.
Koontz, C.J., and Moon, J., concurred.
Reversed and remanded.$89:#GGG#
NOTES
[1] Code | 8.01-401.1 provides:
[2] The tests administered to the father included the Minnesota Multiphasic Personality Inventory, the Rorschach ink blot test, the Wechsler Adult Intelligence Scale Test, the Multiple Affect Adjective Check List, and the Thematic Apperception Test. The test materials and the clinical psychologist's report to Dr. Novello were admitted into evidence.
[3] When she testified, Deaton was employed by the Community Mental Health Center, Psychiatric Institute in Norfolk as a therapist with the children's services and sexual trauma treatment team. She held graduate degrees in science and education, and social work, and was a licensed clinical social worker. Deaton also had presented papers at national and international conferences on sexual abuse. She testified that in the annual course of her professional practice she saw approximately 100 "perpetrators of sexual activity;" she reviewed and evaluated psychological testing results for 50 to 75 of those individuals. Deaton testified that she had studied "testing and measurements, evaluation assessment methods" as part of her training to become a licensed professional counselor.