COURT OF APPEALS OF VIRGINIA


Present:  Judges Frank, Petty and Senior Judge Willis
Argued at Chesapeake, Virginia


ELIZABETH ANDERSON

MEMORANDUM OPINION[*] BY

v.      Record No. 1469-06-1      JUDGE WILLIAM G. PETTY
JULY 31, 2007

CITY OF HAMPTON DEPARTMENT
 OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Wilford Taylor, Jr., Judge

Douglas J. Walter (McDermott, Roe & Walter, on brief), for
appellant.

Rachel Allen, Assistant City Attorney, for appellee.

Charles E. Haden, Guardian *ad litem* for the minor child.


Elizabeth Anderson appeals the trial court's decision approving a change in the foster

care plan relating to her son, M.,[1] and its termination of her residual parental rights as to M.  She

contends that the trial court erred:  1) in changing the foster care plan goal to adoption when she

"was fully compliant with the requirements of Social Services and where the only evidence of

sexual abuse of the minor child was based upon the opinion of one expert witness"; 2) in

terminating her parental rights under Code § 16.1-283(B) when she "completed all of the tasks

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] M. was born on November 29, 1999.  He was four and one-half years old when he came
under the care of DSS in 2004 and six and one-half years old at the time of the *de novo* hearing
in the trial court.
   The trial court terminated Christopher L. Luciano's ("father") parental rights pursuant to
Code § 16.1-283(C)(2), which we affirmed.  Luciano v. Hampton Dep't of Soc. Servs., Record
No. 1462-06-1 (Va. Ct. App. April 24, 2007).  The evidence showed that father failed to comply
with the requirements DSS set forth in the foster care plan.

assigned to her by the Department of Social Services, the conditions which resulted in the original finding of neglect or abuse were substantially corrected and eliminated, and where the termination was based upon the opinion of one expert witness as to possible sexual abuse"; and 3) in terminating her parental rights under Code § 16.1-283(C)(2) when she "completed all of the tasks assigned to her by the Department of Social Services, where [she] was able within twelve months from removal to remedy substantially the conditions which led to or required continuation of the child's foster care placement and where the termination was based upon the opinion of one expert witness as to possible sexual abuse."

Supporting Anderson's position, the guardian *ad litem* further asserts that the trial court erred "in admitting Viola Vaughan-Eden's hearsay testimony concerning out-of-court statements by [M.] where there was no showing that [he] was unavailable or that [his] statements had 'particularized guarantees of trustworthiness and reliability.'"

For the reasons stated below, we affirm the trial court's decision to admit Viola Vaughan-Eden's testimony, its approval of the modification in the change of foster care goal, and its determination that M. suffered neglect or abuse "that presented a serious and substantial threat to his life, health or development." Code § 16.1-283(B)(1). However, we further hold that the evidence was insufficient to support the trial court's conclusion that Anderson was unwilling or unable to substantially remedy the alleged abuse within a reasonable period of time under Code § 16.1-283(B)(2) & (C)(2). Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I. BACKGROUND

"Because the appellee . . . prevailed at trial, we must view the evidence and all reasonable inferences in the light most favorable to it." Lowe v. Dep't of Welfare of the City of Richmond, 231 Va. 277, 279, 343 S.E.2d 70, 71 (1986). On June 2, 2000, the Hampton Juvenile and Domestic

- 2 -

Relations District Court ("juvenile court") awarded legal custody of M. to Anderson, reserving the right of visitation to his father, from whom Anderson was divorced. Anderson married her current husband in 2001. In early 2004, the Hampton Department of Social Services ("DSS") received a report that M. had been physically abused by one or both of his parents. The parents were referred for Parental Capacity Evaluations. According to the factual summary accompanying the evaluations, DSS was concerned with M.'s welfare because of father's "history of being sexually abused as a child and his residing with an uncle who was convicted of sexually abusing his stepsister's child." DSS was also concerned because M., who was frequently injured, stated "on one occasion that his mother threw him into a wall." Moreover, M. had displayed severe behavioral problems at that time.

Anderson was described in the evaluation as being "anxious, introverted, and compulsive," but was open to "professional and Christian counseling interventions." The evaluation also noted that "[h]er parenting beliefs and attitudes were considered to be of concern" and that "her judgment was questionable." On June 10, 2004, based on the results of this Parental Capacity Evaluation and "concerns [about] the parent's ability to care for [M.] appropriately," the juvenile court removed M. from Anderson's custody and placed him in the custody of DSS. Jennifer Nelson, a licensed clinical social worker, examined and treated M. in March and April 2004. She reported that during an April 14, 2004 session, M. "denied being sexually abused." The juvenile court placed M. in a foster home, with the initial goal of "Return to Parent." The Foster Care Service Plan, dated July 23, 2004, required Anderson to comply with several listed responsibilities and requirements.

According to a Foster Care Service Plan Review, prepared on January 10, 2005, Anderson "ha[d] continued to work diligently towards achieving the goals and responsibilities assigned to her to achieve the goal of 'Return to Parent.'" DSS reported that Anderson "has completed two parenting classes, attends weekly therapy, has adhered to the visitation schedule, maintained

employment," and "[p]er the request of her reunification worker, continues to work on the cleanliness of her home."

The Foster Care Plan Review also, however, revealed that M. had recently accused Anderson and her husband of sexually abusing him before he came into foster care. The plan review stated that M.'s allegations of abuse were "explicit and detailed." It concluded that the sole barrier to returning M. to Anderson was "the fact that [M.] has accused [her] and her spouse of physical and sexual abuse that occurred before he came into foster care."

At that point, Shannon Mitchell, a child protective services (CPS) investigator, began to investigate M.'s allegations. On January 11, 2005, Mitchell informed Anderson that she was investigating allegations of sexual abuse that had been made against Anderson. She did not inform Anderson of the specific nature of the allegations. Anderson denied that she had any involvement with any abuse. On February 28, 2005, Mitchell observed M. playing with "anatomically correct" dolls. He selected a black male and a white female doll. Anderson is white. Her husband is black. M. removed the clothing from the dolls and placed one on top of the other. He selected a child doll, placed this in contact with the adult dolls and moved them about. Mitchell did not contact Anderson again after that point. After her investigation was complete, Mitchell concluded that M.'s allegations of sexual abuse by Anderson and her husband were "founded." The abuse was determined to be at the highest level of harm.

On March 8, 2005, upon learning of M.'s allegations that Anderson and her husband had physically and sexually abused him prior to his placement in foster care and that the CPS investigator had determined that the allegations of abuse were "founded," the juvenile court changed the foster care plan's goal from "return home" to "adoption" and directed DSS to file an amended plan consistent with that goal. On July 21, 2005, DSS did so and petitioned for termination of Anderson's parental rights pursuant to Code § 16.1-283.

On August 10, 2005, the juvenile court terminated Anderson's residual parental rights. She appealed to the trial court. By letter dated February 6, 2006, the Assistant City Attorney representing DSS informed the guardian *ad litem* and Anderson's attorney that she intended to present M.'s statements at the *de novo* hearing, pursuant to Code § 63.2-1522. However, she made no such tender.

The trial court heard evidence on March 16, March 21, and April 17, 2006. DSS worker Erica Browning, who had been involved with M.'s case since he had been placed into foster care in June 2004, testified that mother "was very active in participating with services, readily available." According to Ms. Browning, each parent "alleged the other one physically, sexually, mentally and emotionally abused [M.]." When Ms. Browning confronted Anderson with these allegations, Anderson blamed M.'s father and told Ms. Browning that she and the father had been fighting over M. for years. She denied sexually abusing M., saying that she did not want to go to jail.

Ms. Browning testified that the sole impediment to Anderson's continuing parental relationship with M. is that she refuses to admit that she abused M. She testified that an abuser's refusal to recognize the existence of a problem is an impediment to remedying the problem. She further testified that M. cannot function normally, that he needs therapeutic and psychological services, and that she could not recommend M.'s return to Anderson because it would be "risky." When Ms. Browning was asked on cross-examination about DSS procedure when there is an allegation of abuse that the parent denies, the trial court sustained DSS's objection, ruling, "she [Anderson] has denied it," and "[i]t's up to the city to prove it." Ms. Browning explained:

> M. has not been returned to [Anderson] because she has been alleged of sexual abuse [sic]. She has a founded case of sexual abuse against her. The department feels it would be risky for [M.]'s well-being to place [M.] back with someone who he alleges sexually abused him and they deny it ever happened. It would be different if she said, I agree something might have happened, let

me find out what happened. It would be different if she would recognize that there is a problem. We can't fix nothing [sic] that doesn't exist [sic].

Viola Vaughan-Eden, a licensed clinical social worker, was qualified to testify as an expert in the field of child abuse at the trial below. Dr. Vaughan-Eden testified that she was contacted by DSS and asked to provide counseling for M. She began seeing M. in August 2004, when he was four and one-half years old. M. first made allegations of abuse to Dr. Vaughan-Eden in September 2004. He initially reported physical abuse, then made additional allegations of sexual abuse. She wrote down M.'s comments, but did not bring her notes to court nor did she share them with Anderson's attorney. On cross-examination, she was unable to state the year in which the abuse occurred.

When Dr. Vaughan-Eden first saw M., she had "questions as to whether [M.] . . . may have experienced any type of abuse." She recalled that M. had overall "behavioral problems" as well as "a history of aggression [and] acting out, while in foster care." She diagnosed M. as suffering from post-traumatic stress disorder, extreme anxiety and adjustment issues. She described M. as being excitable, slow to follow directions, and said he exhibited oppositional behavior. She opined:

> Based on specific allegations that [M.] made to me, that I had subsequently reported, as mandated, to Social Services, I did determine that, um, he had been, I believe, sexually abused.

Dr. Vaughan-Eden based her opinion on "statements that [M.] made specifically to [her], behaviors that he exhibited . . . while in [her] office, as well as behaviors he had been reportedly exhibiting to the foster parents and others. [T]hose were the primary . . . things." She testified, without elaboration, "there's a whole list of ways in which those statements were relayed and the information was relayed to me that I felt supported what he was making." She described sexualized play M. exhibited with dolls in her office and drawings in which M. drew "what appeared to be like genitalia." Dr. Vaughan-Eden noted that she found M. credible and that he was able to provide

details. Based upon "statements that [M.] made to [her] as well as others . . . that were reportedly made," Dr. Vaughan-Eden concluded that Anderson and her husband sexually abused M., and noted that M. specifically identified Anderson and her husband as his abusers and denied that other people had abused him when asked. She testified that her certainty that Anderson abused M. was "in the high ninety percent range."

Dr. Vaughan-Eden also testified that M.'s sexualized behavior is a typical sign of sexual abuse. She explained that his abnormal and inappropriate sexualized behavior and knowledge of sexual behavior disclosed that he had been exposed to inappropriate sexual behavior. She testified:

> [O]nce you have sexualized behavior that is out of context, then you need to assess whether that sexualized behavior indicates that the child themselves [sic] have experienced sexual abuse, such as fondling, touching, or anything inappropriate to their own body, or whether they've witnessed other people having and engag[ing] in sexualized behavior, or whether they've been exposed to pornography or something of that matter. So you would really try to determine in what context the sexualized behavior is being generalized from.

Dr. Vaughan-Eden testified she was concerned about M. because of his "behaviors as well as statements that he had made that he had experienced sexual abuse."

Dr. Vaughan-Eden testified that M. suffered from post-traumatic stress disorder, that he had suffered a high level of traumatization, and that placement with his mother would not be safe. The trial court held that Dr. Vaughan-Eden gave "compelling testimony" and that her "very credible evidence convinces [it] that this abuse did occur." It noted that she did not speculate and that it was "crystal clear in her mind" that the abuse had occurred.

The parties stipulated that M. "was seen regularly in the years leading up to his removal" by three doctors and "none of these doctors ever observed signs of sexual abuse, molestation, or any sort of physical abuse during their regular contacts with said minor child in the years leading up to [his] removal." Marie Matthews, who oversees M.'s care in his therapeutic foster home,

testified that M. is very aggressive, "extremely difficult to handle," is defiant, and "often displays self-injurious behavior." M. had been taking medication for his behavioral issues for at least one year prior to the hearing in the trial court. Richard Tumblin, a social worker with Children's Hospital of the King's Daughters' child abuse program, also testified about interviews he had with M.'s father. M's father had expressed concern over seeing M. push a four-year-old girl down, "[pinch] her booby," and get on top of her. Tumblin concluded that M. was demonstrating sexualized behavior as well. Other evidence at the *de novo* trial established that M. had a "psychiatric breakdown" shortly after entering foster care and had to spend a week at the Peninsula Behavior Institute. M. is also developmentally delayed and suffers from a heart condition.

Janice McKee, the home reunification specialist who worked with Anderson after M. was placed in foster care, testified that Anderson met the goals of the service plan and did all that was expected of her as part of the foster care plan. In observing visitations, Ms. McKee saw nothing in the interaction or in M.'s demeanor to indicate he was frightened or afraid. Anderson did not testify.

The trial court ordered the foster plan goal changed to "adoption" and terminated Anderson's residual parental rights, citing Code § 16.1-283(B) and Code § 16.1-283(C)(2).

This appeal followed.

## II. ANALYSIS

### A. Admissibility of Dr. Vaughan-Eden's Testimony

The guardian *ad litem*, in support of Anderson's position, argues that the trial court erred "in admitting Viola Vaughan-Eden's hearsay testimony concerning out-of-court statements by [M.] where there was no showing that [he] was unavailable or that [his] statements had 'particularized guarantees of trustworthiness and reliability.'" In addressing this issue, we are

- 8 -

mindful that the admissibility of evidence rests in the sound discretion of the trial court. Breeden v. Commonwealth, 43 Va. App. 169, 184, 596 S.E.2d 563, 570 (2004). We hold that the trial court did not abuse its discretion in admitting Dr. Vaughan-Eden's testimony.

Code § 63.2-1522 provides for the admission of "an out-of-court statement made by a child the age of twelve or under at the time the statement is offered into evidence, describing any act of a sexual nature performed with or on the child by another, [which is] not otherwise admissible by statute or rule." Section 63.2-1522(B) carefully delineates under what circumstances a child's out-of-court statement may be admitted into evidence. Here, DSS did not seek to admit M.'s out-of-court statements pursuant to Code § 63.2-1522. Dr. Vaughan-Eden's testimony was, however, admitted into evidence under Code § 8.01-401.1, which allows for the admission of an expert's opinion testimony even when his or her opinion is based upon information that would be not be admissible in evidence.

Here, DSS made no attempt to comply with the procedure set forth in Code § 63.2-1522 at trial or to otherwise introduce M.'s statements into evidence. Moreover, the trial court refused to permit a recitation of M.'s out-of-court statements upon objection by Anderson and by the guardian *ad litem*. Instead, the trial court ruled that it would receive the expert's opinion into evidence pursuant to Code § 8.01-401.1, even though that opinion was based on inadmissible, and thus unadmitted, evidence. See Holmes v. Levine, 273 Va. 150, 164, 639 S.E.2d 235, 242 (2007) (recognizing that, pursuant to Code § 8.01-401.1, an expert witness may base his or her opinion on inadmissible evidence); see also M.E.D. v. J.P.M., 3 Va. App. 391, 401, 350 S.E.2d 215, 222 (1986) ("Code § 8.01-401.1 authorized [expert witnesses] to express their opinions that the [parent] sexually abused the child."). Neither Anderson nor the guardian *ad litem* objected to this ruling. The parties did not undertake, pursuant to the second sentence of Code § 8.01-401.1, to cross-examine Dr. Vaughan-Eden as to the character or substance of the information,

- 9 -

including M.'s statements, upon which her opinion was based. Thus, her opinion was received into evidence without challenge as to the character or sufficiency of its predicate. We therefore conclude that the guardian *ad litem's* objection at trial, and his argument on appeal, are without merit.

### B. Change in Goal

We recognize the well-settled principle that "[w]hen addressing matters concerning a child . . . the paramount consideration of a trial court is the child's best interests." Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991). "In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990). The preponderance of the evidence must support the trial court's decision when modifying a foster care plan pursuant to Code § 16.1-282. Padilla v. Norfolk Div. of Soc. Servs., 22 Va. App. 643, 645, 472 S.E.2d 648, 649 (1996).

On appeal, we presume that the trial court "thoroughly weighed all the evidence, . . . and made its determination based on the child's best interests." Farley, 9 Va. App. at 329, 387 S.E.2d at 796. Furthermore, "[w]here, as here, the trial court heard the evidence *ore tenus*, its finding [of credibility, fact and weight] is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986).

The trial court's decision to approve the change in the foster plan goal is not plainly wrong and is supported by credible evidence. That judgment is affirmed as well.

### C. Termination of Parental Rights

While we hold that the trial court did not err in admitting Dr. Vaughan-Eden's testimony or in modifying the foster care goal, we must reverse the trial court's termination of Anderson's

parental rights, and remand this case for further fact-finding. In making this decision we recognize that "trial courts are vested with broad discretion" in matters of a child's welfare, Farley, 9 Va. App. at 328, 387 S.E.2d at 795 (citing Eichelberger v. Eichelberger, 2 Va. App. 409, 412, 345 S.E.2d 10, 12 (1986)), and that the "trial court's determination of matters within its discretion is reversible on appeal only for an abuse of that discretion . . . and a trial court's decision will not be set aside unless plainly wrong or without evidence to support it," id. (citations omitted). We are also mindful, however, that a trial court abuses its discretion if it makes an error of law. Shooltz v. Shooltz, 27 Va. App. 264, 271, 498 S.E.2d 437, 440-41 (1998).

### 1. Due Process Considerations

Our Supreme Court has long-recognized that "[t]he termination of parental rights is a grave, drastic and irreversible action." Lowe, 231 Va. at 280, 343 S.E.2d at 72. Indeed, the Court has stated:

> Our prior decisions clearly indicate a respect for the natural bond between children and their natural parents. The preservation of the family, and in particular the parent-child relationship, is an important goal for not only the parents but also government itself. While it may be occasionally necessary to sever the legal relationship between parent and child, those circumstances are rare. *Statutes terminating the legal relationship between parent and child should be interpreted consistently with the governmental objective of preserving, when possible, the parent-child relationship.*

Weaver v. Roanoke Dep't of Human Resources, 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980) (emphasis added).

The United States Supreme Court has recognized the vitally important nature of the parent-child relationship as well. It has held that the Due Process Clause of the Fourteenth Amendment guarantees a parent's liberty interest in "the companionship, care, custody and management of his or her children." Stanley v. Illinois, 405 U.S. 645, 651-52 (1972). Of course,

this interest is not unlimited and must be balanced against the state's competing legitimate interest in protecting the welfare of its citizens. Lassiter v. Dep't Soc. Servs. of Durham City, 452 U.S. 18, 27 (1981). "Thus, although a parent and child have a constitutionally protected parent-child relationship, the state also has a recognized interest in protecting children from abuse and neglect in the home." Wright v. Alexandria Div. of Soc. Serv., 16 Va. App. 821, 829, 433 S.E.2d 500, 505 (1993) (citations omitted). In Code § 16.1-283, our General Assembly required that the reasons for terminating parental rights be proven by clear and convincing evidence; this high standard of proof recognizes the importance of preserving the family if it is also possible to protect the child from abuse or neglect. Id. at 829-30, 433 S.E.2d at 505; see also Santosky v. Kramer, 455 U.S. 745, 768 (1982) ("A majority of the States have concluded that a 'clear and convincing evidence' standard of proof strikes a fair balance between the rights of the natural parents and the State's legitimate concerns. We hold that such a standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process." (citation omitted)).

Because Anderson has a constitutional right to the companionship of her child, we must "satisfy the mandates of procedural due process" before we infringe upon that right, even if we are doing so to protect a child from abuse or neglect. Wright, 16 Va. App. at 829, 433 S.E.2d at 505 (citing Quilloin v. Walcott, 434 U.S. 246, 254 (1978)). Thus, in order to satisfy procedural due process in the context of the termination of parental rights, "the state is required to provide the parent with 'fundamentally fair' procedures in the termination proceeding." Id. (citing Lassiter, 452 U.S. at 33).

Code § 16.1-283 provides fundamentally fair procedures for the termination of parental rights "designed to protect the rights of the parents and their child." Rader v. Montgomery County Dep't of Soc. Servs., 5 Va. App. 523, 527, 365 S.E.2d 234, 236 (1988). In order to

provide a "constitutionally valid termination of parental rights," however, those "procedures must be strictly followed . . . ." Id. Thus, in the termination of parental rights context, careful adherence to the statutory scheme is especially vital to safeguard parents' due process rights. While this is a close case, we must conclude that the trial court did not follow these procedures when it terminated Anderson's parental rights based on factual findings supported by less than clear and convincing evidence.

## 2. Code § 16.1-283 (B)

Before a court may terminate parental rights, Code § 16.1-283(B) requires clear and convincing evidence of three facts: (1) the child suffered neglect or abuse; (2) the neglect or abuse presented a serious and substantial threat to the child's life, health or development; and (3) it is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated within a reasonable period of time. Code § 16.1-228 defines an abused or neglected child, in pertinent part, as a child whose parent (1) "creates or inflicts . . . a physical or mental injury, . . . or creates a substantial risk of death, disfigurement or impairment of bodily or mental functions . . . " or (2) " [w]hose paren[t] . . . commits or allows to be committed any sexual act upon a child in violation of law."

While "[t]he odiousness of child sexual abuse makes it perhaps the gravest issue that can be presented in a domestic controversy," M.E.D., 3 Va. App. at 396, 350 S.E.2d at 219, there is no statutory authorization for the termination of parental rights based solely on the occurrence of a single act of either physical or sexual abuse. Instead, our General Assembly chose to qualify the kind of abuse that leads to termination of parental rights under Code § 16.1-283(B) in two ways. The abuse must be both the kind of abuse that "presents a serious and substantial threat to [the child's] life, health or development" and cannot be corrected or eliminated within a

- 13 -

reasonable period of time.[2]  Code § 16.1-283(B)(1) & (2).  When interpreting statutes, we must

"ascertain and give effect to the intention of the legislature."  Chase v. DaimlerChrysler Corp.,

266 Va. 544, 547, 587 S.E.2d 521, 522 (2003).  That intent is usually self-evident from the words

used in the statute.  Id.  Had the General Assembly intended to otherwise provide for the

termination of parental rights, it would have made that intention manifest in the statute.[3]

Code § 16.1-283(B)(1)

Subsection (B)(1) requires a finding that the abuse or neglect suffered by a child presents

"a serious and substantial threat to his life, health or development" before parental rights may be

terminated.  Anderson challenges the trial court's determination that this standard was met in this

case, arguing that it was based only on the testimony of one expert witness.  We agree that

Dr. Vaughan-Eden's assertion that M. had been "sexually abused," standing alone, is insufficient

to establish the required findings; however, this record contains ample other evidence from

which the trial court was free to infer that M. had suffered abuse meeting the criteria of Code

§ 16.1-283(B)(1).

In making its decision, the trial court did cite the testimony of DSS's expert witness,

Dr. Viola Vaughan-Eden, as well as other evidence.  Vaughan-Eden testified that M. was "acting

out," tended to be aggressive, and was "highly anxious and slow to follow directions."  She

diagnosed him with post-traumatic stress disorder.  She also stated that M. made "specific

allegations" to her that led her to conclude that he had been sexually abused.

---

[2] We also note that Erica Browning, the Hampton DSS foster care social worker assigned to this child's case, testified that termination of parental rights is not sought in every instance of child sexual abuse.

[3] Even under Code § 16.1-283(E), which permits the termination of parental rights solely upon finding a parent has subjected a child to aggravated circumstances, sexual abuse must either be "chronic or severe" or, in the case of a single act or commission, "(i) evinces a wanton or depraved indifference to human life, or (ii) result[s] in the death of [the] child or in serious bodily injury to [the] child."

Dr. Vaughan-Eden's testimony fell short of the "clear and convincing" standard of proof, however, because DSS did not present any evidence to the trial court from which it could have inferred what Dr. Vaughan-Eden meant by the term "sexual abuse." She did not define that term as it is typically used in her profession, nor did she testify as to the severity or duration of the abuse in this case. Hence, the trial court would have had to speculate that Vaughan-Eden's use of the undefined term "sexual abuse" provided clear and convincing evidence of abuse or neglect as defined by Code § 16.1-228 and that the abuse and neglect were so severe as to "presen[t] a serious and substantial threat to [the child's] life, health or development." Code § 16.1-283(B)(1). While this opinion, standing alone, would not support the trial court's conclusion, it is relevant in corroborating other evidence of abuse.

DSS presented significant evidence indicating M. had been seriously abused and that the abuse presented a substantial threat to his life, health, and development. This included evidence from CPS investigator Mitchell, who testified as to M.'s sexualized play using anatomically correct dolls, as well as testimony from social worker Tumblin regarding M.'s inappropriately sexualized behavior. Moreover, the trial court heard from numerous witnesses describing M.'s severe emotional, psychological, and developmental problems. This testimony, in combination with Dr. Vaughan-Eden's testimony as to her interaction with M. and her expert opinion regarding his condition and the reasons for it, provided the trial court with an abundant basis for finding M. was abused within the meaning of Code § 16.1-283(B)(1). Thus, viewing the record as a whole, we conclude that the trial court did not err and affirm its decision.

### Code § 16.1-283(B)(2)

The testimony and facts of this case are certainly highly disturbing, and they reveal a minor child who is clearly in crisis. However, there is a paucity of evidence in this record indicating that Anderson could not correct or eliminate the conditions that led to the abuse in this

case—an element required for termination of parental rights under Code § 16.1-283(B)(2). The statute itself directs trial courts to "take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies . . . ." Further, the statute states that the parent's failure, without good cause, to respond or follow through "with appropriate, available and reasonable rehabilitative efforts on the part of social, medical, mental health or other rehabilitative agencies designed to reduce, eliminate, or prevent the neglect or abuse of the child" is prima facie evidence that the requirements of subsection (B)(2) have been met.

In this case, however, M., who was already in foster care for reasons completely unrelated to any allegation of sexual abuse by Anderson, only made allegations of sexual abuse in late 2004. Those allegations were brought to the attention of both the juvenile court and Anderson in January of 2005. Following a rather brief investigation, Anderson's parental rights were terminated on March 8, 2005. There is no evidence that Anderson was offered any services or given any chance to demonstrate a willingness to eliminate the cause of the sexual abuse in this case during the fewer than eight weeks after she denied the allegations. Instead, both Mitchell, the CPS investigator, and Browning, the DSS social worker, testified that once Anderson denied the sexual abuse allegations, they made no further effort to work with her. Prior to that time, however, Anderson had been very cooperative and willing to follow through on counseling, visitation, and training.

Moreover, there is no evidence in the record showing that anyone from DSS or CPS specifically told Anderson the substance of the abuse allegations. On the contrary, CPS investigator Mitchell explained that she "indicated to [Anderson] that there were allegations in regard to sexual abuse," and DSS worker Browning stated that she told Anderson "in general in January of '05 that M. had made some allegations" that would have to be referred to CPS.

- 16 -

Browning also testified that, at that time, she did not tell Anderson that she was accused of the abuse, because "it was before [M.] specified her." Browning explained that when she interacts with parents, she "give[s] them the big picture," indicating that she did not have a very in-depth conversation with Anderson regarding the nature of the abuse allegation.

Here, although we are careful to avoid placing the "technical legal rights of the parent" before the "welfare of the child" in this case, Forbes v. Haney, 204 Va. 712, 716, 133 S.E.2d 533, 536 (1963), we must conclude that the trial court erred when it determined that it was not reasonably likely that the conditions which resulted in the abuse could not be substantially corrected or eliminated so as to allow M.'s return to Anderson within a reasonable period of time when there was no evidence suggesting that Anderson had had an opportunity to demonstrate whether she was willing to eliminate the cause of the abuse. Code § 16.1-283(B)(2). Hence, we conclude that the trial court did not have sufficient clear and convincing evidence before it to find that the abuse in this case could not be eliminated within a reasonable period of time, and we must remand the case for further factual findings under Code § 16.1-283(B)(2).

### 3. Code § 16.1-283(C)(2)

Under Code § 16.1-283(C)(2), the residual parental rights of a parent of a child placed in foster care may be terminated only if the court finds by clear and convincing evidence that (1) termination is in the best interests of the child; (2) the parent, without good cause, has been unwilling or unable within a reasonable period not exceeding twelve months to substantially remedy the conditions that led to or required the continuation of the child's foster care placement; and (3) the parent failed to remedy the conditions leading to foster care notwithstanding the reasonable and appropriate efforts of rehabilitative agencies.

Once again, the evidence in the record does not support the trial court's finding that Anderson was unwilling or unable to remedy the situation that led to M.'s removal from the

home.  On the contrary, the record shows that Anderson had complied with all of DSS's directives, until she denied the allegation of "sexual abuse."  Anderson's denial that any abuse occurred in this case does not end our inquiry because the language of subsection (C)(2) imposes a positive duty upon DSS to offer "reasonable and appropriate . . . social, medical, [and] mental health" services before terminating parental rights under this section.  See Weaver, 220 Va. at 928-29, 265 S.E.2d at 697 (holding that a social service agency's failure to assist a parent in remedying conditions that caused foster care will result in reversal of a termination order when the record on appeal did not show what, if any, measures were taken by rehabilitative agencies).

The testimony at trial revealed that Anderson "was very active in participating with services" offered by DSS, and was "readily available" to remedy the situation with her child.  However, according to DSS worker Erica Browning, when the allegation of sexual abuse was raised, Anderson denied that she had abused her child and reportedly said that she did not "want to go to jail because of something he said."  Browning stated "the barrier in this particular case [to returning M. to Anderson] with regards to [M.] alleging that the mother and stepfather abuse him, is that we can't put services in place to remedy the situation if she doesn't even recognize that it happened."[4]  Browning further explained:  "It would be different if she would recognize that there is a problem.  We can't fix nothing [sic] that doesn't exist [sic]."

Here, the trial court had to speculate about Anderson's refusal to address the allegation of sexual abuse because the record does not indicate that anyone from DSS confronted Anderson and told her what it was that M. actually accused her of doing, nor does the record indicate that DSS offered Anderson any of the rehabilitative services required under subsection (C)(2)

---

[4] In response to the guardian *ad litem*'s question, "So, you're saying for [Anderson] to even be considered possibly as a person to have a child placed with, she has to make an admission of guilt, is that correct?"  Browning answered, "She has to recognize that there is an issue to correct, the issue and an issue that [M.] has to be protected from. . . . That's how social services works."

- 18 -

following her denial of the sexual abuse allegation. Thus, the record in this case does not show a situation involving a parent truly recalcitrant in the face of evidence of sexual abuse or one that was unwilling to participate in rehabilitative programs.

On the contrary, the record reveals a parent that was compliant with DSS's directives until she denied that her child had been "sexually abused." The statute is devoid of any language predicating DSS's duty to offer appropriate social, medical or mental health services on an individual's denial or acceptance of a particular problem. Counseling could have helped Anderson realize and accept that there was, in fact, a problem and enabled her to address it under subsection (C)(2). Because the record does not show that Anderson was offered any rehabilitative services and because the trial court was left to speculate as to Anderson's inability or refusal to remedy the conditions that led to M.'s placement in foster care, we reverse and remand the trial court's findings under Code § 16.1-283(C)(2) as well.

### III. CONCLUSION

For the reasons discussed above, we affirm in part and reverse in part, and remand to the trial court for further fact-finding as to the termination of Anderson's parental rights under Code § 16.1-283(B)(2) & (C)(2).

Affirmed in part, reversed in part and remanded.

Willis, J., dissenting.

The majority acknowledges the correctness of the trial court's finding that the child was sexually abused by Ms. Anderson and her husband and thereby suffered serious and ongoing injury. It reverses the trial court's decision on the ground that the evidence fails to prove that the Department of Social Services offered Ms. Anderson appropriate remedial services despite her denial of that abuse. It holds that the resulting scenario is insufficient to support the finding that Ms. Anderson was unable or unwilling to correct the abuse and resulting injury within a reasonable time.

The trial court heard and expressly believed witnesses, who presented professional credentials, who testified that in light of Ms. Anderson's denials, attempts at remedial services would be unavailing. No party challenged, sought to enlarge, or contradicted this testimony. The majority parses the written record to make a sufficiency analysis, ignoring the fact that the trial court had before it the witnesses themselves, could observe their demeanor, and was in the best position to assess their credibility and the weight to be given their testimony.

The majority states, "we are careful to avoid placing the 'technical legal rights of the parent' before the 'welfare of the child.'" In my view, this decision does just that. It leaves the severely injured child in jeopardy while obliging the social services officers and the trial court to pursue a program shown by the uncontradicted evidence to be fruitless.

I would affirm the judgment of the trial court.